Thomas L. **NOWLIN**, Appellant,

v.

**UNITED STATES**, Appellee.

Nos. 11081, 11731.

District of Columbia Court of Appeals.

Argued Nov. 8, 1977.
Decided Jan. 10, 1978.

---

Raymond M. Hertz, Columbia, Md., for appellant.

Thomas J. Tourish, Jr., Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, and William D. Pease, Asst. U. S. Attys., were on the brief for appellee.

Before KELLY, KERN and HARRIS, Associate Judges.

KERN, Associate Judge:

Appellant was convicted by a jury of assault with intent to kill (D.C. Code 1973, § 22–501) and assault with a dangerous weapon (D.C. Code 1973, § 22–502).[1] He contends on appeal that the trial court erred (1) in excluding the testimony of an individual who had violated the sequestration order previously imposed on witnesses by the court; (2) in denying appellant's request for a missing witness instruction; and (3) in denying appellant's motion for a new trial based on newly discovered evidence. We affirm the convictions.

The evidence adduced at trial reflects long-standing tension between complainant, Edward Scott, and appellant over the latter's interest in Scott's estranged wife.

---

1. Appellant was found not guilty on a charge of assault with intent to kill while armed (D.C.Code 1973, §§ 22–501, –3202).

This hostility culminated on the night of August 27, 1975, when appellant, armed with a shotgun and accompanied by his uncle and complainant's wife, drove to complainant's apartment. Appellant testified that he saw Mr. Scott on the porch with another man and a boy, whom he did not recognize.[2] Appellant, who alleged that he had previously received a threatening phone call from Scott, called out to complainant to come to the car because he wanted to talk to him. Instead, Mr. Scott said something unintelligible and went into the house. Appellant and his witnesses testified that when Scott stepped back onto the porch, he held a shotgun which he leveled at their car. They drove further down the block and stopped. Appellant then stepped from the car with a shotgun in his hand, dropped down behind a small embankment, and fired one shot at Mr. Scott. Although Scott was not injured, the door jamb and screen of the house were damaged at chest level.

On the contrary, Mr. Scott and his son Darryl both asserted at trial that Scott did not own a gun and had not had one in his possession on the night of the altercation. In addition, Scott testified that he had never threatened appellant.

Appellant's first contention on appeal is that the trial court erred in excluding the testimony for the defense of an individual who had been seated in the courtroom on the previous day while government witnesses testified, thereby violating a sequestration order previously imposed on witnesses by the court.

On the second day of trial, defense counsel proffered to the court that he had been approached that morning by Preston Dixon, whom he had not previously intended to call as a witness, who had revealed to counsel that he (Dixon) had personally received abusive phone calls from Mr. Scott intended for appellant. Dixon testified outside the presence of the jury that he was appellant's cousin and former roommate, and that several months earlier he had received a phone call at Nowlin's apartment in which Scott, apparently believing that he was speaking with appellant, cursed and threatened him. Another time Dixon received a phone call in which he thought he recognized Scott's voice. Dixon stated further that he had informed appellant of these phone calls.

The trial court found that the proffered testimony was relevant evidence of prior threats which would be admissible on the question of who was the likely aggressor where the issue was self-defense, but the court held that the rule on the sequestration of witnesses had been in effect and therefore the government's objection to Dixon's testimony would be sustained. The judge indicated that he found it difficult to believe that "defendant Nowlin[,] being apprised [by counsel] of the relevance of prior threats[,] would not recall that his roommate had communicated to him a prior threat that he had received vicariously on behalf of the defendant." The court also expressed concern over

> the fact that the witness who was placed on the stand right before this is another unintroduced witness who is related to the defendant, who was going to offer testimony which suddenly became available to counsel during trial [3] . . . [T]he Court deems it somewhat strange that all this type evidence . . . is turning up well after the case is fully prepared for trial . . . like a cracker out of the box. . . .

The court concluded that "[o]ne of the reasons for the rule on witnesses is to prevent manufacturer of evidence sua sponte by witnesses, to insure that testimony is not tailored based on what has gone before," and therefore excluded Dixon's testimony.

---

**2.** Although the boy was Darryl Scott, neither appellant nor Mrs. Scott, the child's mother, recognized him. The other man was James Daniels, whom complainant knew only as "James."

**3.** This reference is to testimony during which David Nowlin, appellant's cousin, began to recount a conversation he had with complainant's son concerning guns. The court excluded David Nowlin's statement that Darryl Scott had offered to sell him a pistol, which belonged to Darryl's father, for fifty dollars.

Appellant argues that although it is in some situations proper to exclude relevant evidence, the general rule is that a witness will not be disqualified merely for violating an order of exclusion from the courtroom. In support of this contention he cites *Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893):

> If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground merely . . ..

As appellant acknowledges, *Holder* goes on to say, however, that "the right to exclude under particular circumstances may be supported as within the sound discretion of the trial court." *Id.*

Courts have interpreted this language restrictively and have permitted the exclusion of witnesses who are in violation of a court's order of sequestration only "under special circumstances when it is shown that the violation was with the connivance or knowledge of the party or his counsel." *Jett v. Jett,* D.C.App., 221 A.2d 925, 927 (1966). *See District of Columbia v. Flagg,* 42 App.D.C. 73, 77 (1914); *accord, Taylor v. United States,* 388 F.2d 786, 788–89 (9th Cir. 1967); *United States v. Schaefer,* 299 F.2d 625, 631 (7th Cir.), *cert. denied,* 370 U.S. 917, 82 S.Ct. 1553, 8 L.Ed.2d 497 (1962).

■ Because a "trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process [,] . . . his determination will be reviewed only for abuse of discretion." *Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976), *citing Goldsby v. United States,* 160 U.S. 70, 74, 16 S.Ct. 216, 40 L.Ed. 243 (1895); *United States v. Martinez-Villanueva,* 463 F.2d 1336 (9th Cir. 1972); *Nelson v. United States,* 415 F.2d 483, 487 (5th Cir. 1969), *cert. denied,* 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970). In this case we conclude that it was within the sound dis-

cretion of the trial judge to exclude testimony which, although relevant, was in violation of the rule on witnesses and was "with the connivance or knowledge" of appellant. *Jett v. Jett, supra.* Although the trial judge did not state explicitly that he was making a finding of connivance, the record reflects that the court gave careful consideration to the factual context in which the offer of testimony had been made, and the court clearly implied that it could conceive of no way other than connivance that such testimony should suddenly be available "like a cracker out of the box." On this record, we cannot find abuse of discretion.

■ Appellant contends, second, that the government's failure to call as a witness James Daniels, one of the two men present during the confrontation on the night in question, entitled him to the benefit of the so-called missing witness instruction. Under the missing witness doctrine, a jury is permitted to draw an inference that testimony, if produced, would have been unfavorable to the party who fails to call a witness whose testimony could "elucidate the transaction" at issue and who is peculiarly available to the party who fails to produce him. *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893); *Hale v. United States,* D.C.App., 361 A.2d 212, 216 (1976); *Fleming v. United States,* D.C.App., 310 A.2d 214, 220 (1973). Appellant argues that because the question of whether complainant was armed with a shotgun at the time of the incident was disputed, *viz.,* complainant and his son said that he was not armed, and appellant and his two witnesses said that he was, the testimony of Daniels would have elucidated the incident. We note, however, that a missing witness instruction is not required if the absent witness' testimony would be merely cumulative, as arguably it would be here. *Anderson v. United States,* D.C.App., 352 A.2d 392, 394 n.4 (1976), *citing Brown v. United States,* 134 U.S.App.D.C. 269, 270–71 n.2, 414 F.2d 1165, 1166–67 n.2 (1969); *Morton v. United States,* 79 U.S.App.D.C. 329, 332, 147 F.2d 28, 31, *cert. denied,* 324

U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428 (1945); 2 Wigmore, Evidence § 287 (3d ed. 1940).

Moreover, before appellant would have been entitled to a missing witness instruction, he must have established that the witness was "peculiarly within [the government's] power to produce." *Graves, supra.* The trial judge denied the requested instruction on the grounds that

> there is no evidence that the witness, number one, is peculiarly known to one side. But, even assuming the witness is peculiarly known to one side, there is no evidence that one side has a peculiar ability to produce him.

The record in this case adequately supports this finding of the trial court. Complainant Edward Scott testified that he did not know James Daniels' last name and he did not know where the man lived, but only that "he used to be in the neighborhood a lot."[4] None of the other government witnesses knew Daniels' true name or address, either past or present.

■ Appellant objects that the government was aware of the existence of Mr. Daniels at least as early as a grand jury hearing in November 1975, but that it did not attempt to locate him until one day before trial, and then only by a scan of correctional institutions in the Washington area. It has been held, however, that "a

bona fide endeavor" to put a witness on the stand, even where "the Government's effort was 'last minute' and 'lackadaisical,'" will "fatally undercut any claim appellant might have had to a missing witness instruction." *Stewart v. United States,* 135 U.S.App.D.C. 274, 279, 418 F.2d 1110, 1115 (1969).[5] In the instant case, the last name of the witness was not certain, his address was unknown, and the government exhausted the only lead it had as to his whereabouts. This is sufficient proof of the government's good faith in attempting to find the witness, and the court properly refused to give the requested missing witness instruction. *See Smith v. United States,* D.C.App., 315 A.2d 163, 168, *cert. denied, Jefferies v. U. S.,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

Appellant's final contention is that the trial court improperly denied his motion for a new trial based on newly discovered evidence. Appellant filed the motion on July 2, 1976, and offered an affidavit in which the complainant's son, Darryl Scott, recanted his trial testimony and averred that he was now prepared to testify that his father, Edward Scott, was carrying a shotgun on the night of the incident.[6] On July 9, 1976, prior to the court's ruling on that motion, appellant filed a notice of appeal from the judgment of conviction. The trial court then ruled that the filing of the notice of appeal "divests . . . this court of jur-

---

4. Scott said he had been "told his last name was Daniels, but all I knew was James, so it's speculation on my part." He stated, however, that when he last saw Daniels in December of 1975, he asked him to contact the police detective who had been assigned to investigate the case.

5. In *Stewart,* no subpoena was issued as to the witness until the Friday before the Monday on which trial was to begin, and when service could not be obtained at the witness' address on record, no effort was made to find another address for him. *Stewart v. United States, supra,* 135 U.S.App.D.C. at 279 n.2, 418 F.2d at 1115 n.2.

6. Darryl Scott stated further that he had lied about this matter at his father's request. In Mrs. Scott's testimony during trial, the following exchange occurred:

> [MRS. SCOTT]: Darryl told me that his father had told him to tell the people down here that he did not have a gun, because he was on probation, and if they found out that

he had a gun, he would go back to jail, and Darryl do [sic] not want his father to go to jail.
>
> THE COURT: So you are saying that Darryl is committing perjury to keep his father out of jail?
>
> THE WITNESS: He doesn't know any better, Your Honor. I told Darryl when he came down here to tell the truth, Your Honor.

The government then recalled Darryl Scott, who denied that he had ever made such a statement to his mother and reaffirmed his earlier testimony that his father did not have a gun on the night of the offense. Mrs. Scott's testimony, however, parallels Darryl Scott's later affidavit, in which he said:

> [M]y Father . . . told me to say that he did not have a gun because He was afraid that he would to go jail. When I told the Judge and Jury that my Father did not have a gun [,] I lied. I was afraid that my Father would be sent to jail.

isdiction to rule on the motion for new trial," and so "the motion must be, and hereby is, denied for lack of jurisdiction." Appellant never filed a notice of appeal from this order.

Subsequently, however, appellant filed a second motion for new trial before a different judge, raising the same issue. This motion was denied without a hearing also because of "lack of jurisdiction." It is from this second ruling that this appeal has been taken.

■■■ We conclude that the court properly denied appellant's motion for new trial. Since no appeal was taken from the denial of the first motion for new trial, and the second such motion was upon precisely the same grounds as the first, appeal of the second motion was barred by the doctrine of res judicata. *Saunders v. United States*, 89 U.S.App.D.C. 291, 293, 192 F.2d 409, 410 (1951). *See also District of Columbia v. Nave Typographic Corp.*, D.C.App., 234

A.2d 176, 177 (1967); *Wilson v. United States*, 166 F.2d 527, 529 (8th Cir. 1948).[7]

*Affirmed.*

---

**7.** Although appellant did not challenge the trial court's denial of his first motion for new trial on the ground of newly discovered evidence, we note that the trial court assumed that appellant's filing of the notice of appeal divested it of jurisdiction to consider appellant's motion. Yet such a motion may be heard by the court despite the pendency of an appeal. *Smith v. Pollin*, 90 U.S.App.D.C. 178, 179, 194 F.2d 349, 350 (1952); 8A J. Moore, Federal Practice— Criminal Rules, ¶ 33.03[2] at 33–17 (2d ed. 1965), *citing* Rule 33 (by implication); *Richardson v. United States*, 360 F.2d 366 (5th Cir. 1966). Where a material witness recants his former testimony, as appellant asserted in his motion, the trial court has limited jurisdiction to determine (1) whether the recantation is indeed "newly discovered" evidence; (2) whether the evidence is material and not cumulative or impeaching; and (3) whether the recantation is of such a nature that it would probably produce an acquittal in the event of retrial. *See* Moore, *supra* at ¶ 33.03[1], at 33–14. The trial court may then deny the motion for new trial or indicate that it will grant the motion. In the latter situation, where the court is inclined to grant the motion for new trial, a motion for remand is made in the appellate court. *Smith v. Pollin, supra*. Thus, the trial court clearly did have jurisdiction to consider the appellant's motion for new trial.

The substance of the trial court's order denying appellant's motion, however, went beyond

this mere jurisdictional finding and denied the motion for new trial on the merits. Thus, the court stated that it would have denied the motion "both on the grounds set forth in the Government's opposition" to appellant's motion for new trial, *viz.*, that the newly discovered evidence was merely cumulative and impeaching and that it would not produce an acquittal in a new trial, and also on the additional ground that:

> as a matter of law, taking the defendant's case as true, there was no self-defense and the Court could have properly refused to permit a self-defense issue to go to the jury. Since Darryl's "recantation" is relevant only to "self-defense," the defendant is not entitled to a new trial.

From the record it is clear that the jury was aware that the credibility of Darryl's testimony was in question (*see* note 6, *supra*), and so this "new" evidence was properly considered to be immaterial. Moreover, appellant had no legitimate claim to the defense of self-defense, since he had voluntarily placed himself in a position which he could reasonably expect would result in violence. Self-defense "is not available to one who finds trouble by going out of his way to look for it." R. Perkins, Criminal Law 1008 (2d ed. 1969). Consequently, we conclude that the trial court did not err in denying appellant's motion.