Quinton L. TABRON, Appellant,

v.

UNITED STATES, Appellee.

No. 80–952.

District of Columbia Court of Appeals.

Argued Nov. 10, 1981.

Decided April 6, 1982.

Francis D. Carter, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom, Public Defender Service, Washington, D. C., at the time the brief was filed, was on the brief, for appellant.

Regina C. McGranery, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty. at the time the brief was filed, and John A. Terry, Michael W. Farrell, and Richard C. Otto, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and FERREN, Associate Judges.

FERREN, Associate Judge:

This case comes before us a second time. In *Tabron v. United States*, D.C.App., 410 A.2d 209 (1979), in which a jury convicted appellant of first-degree murder while armed and related offenses, we remanded the case for further proceedings because the trial court had denied a defense request "to order the government to produce at trial for impeachment purposes the prior convictions and juvenile adjudications of its witnesses." *Id.* at 211. We left it to the trial court to determine whether government witnesses had prior convictions or adjudications and, if so, whether the government's failure to disclose them deprived appellant of a fair trial by compromising the opportunity to cross-examine as to bias and general credibility. Upon remand, the government disclosed to the court that five of its six eyewitnesses had prior juvenile adjudications. After reviewing these records *in camera*, the trial court issued a comprehensive memorandum and ruled that the government's failure to disclose these records did not entitle appellant to a new trial.

We sustain the trial court's ruling. First, as to bias, we conclude beyond a reasonable doubt that cross-examination about prior juvenile adjudications would not have weakened the impact of testimony by government witnesses who had a relationship with the court (*e.g.*, probation) during the period of investigation, prosecution, and trial of this case. *See Springer v. United States*, D.C.App., 388 A.2d 846, 856 (1978). Second, as to general credibility, we sustain the trial court's conclusion that cross-examination about prior adjudications of government witnesses who did not have a relationship with the court during the period at issue would not have affected the outcome of the trial. *See Lewis v. United States*, D.C.App., 393 A.2d 109 (1978), *aff'd on rehearing*, D.C.App., 408 A.2d 303, 312 (1979). Accordingly, we affirm appellant's convictions for first-degree murder while armed, D.C.Code 1973, §§ 22–2401, –3202, possession of a prohibited weapon (a rifle) with intent to use it unlawfully against another, D.C.Code 1973, § 22–3214(b), and two counts of possession of a prohibited weapon (a sawed-off shotgun), D.C.Code 1973, § 22–3214(a).

## I.

The facts are summarized in *Tabron, supra* at 211. The government based its case, to a substantial extent, on the testimony of six eyewitnesses to a shooting that emanated from a group of boys on a hill behind a People's Drug store, allegedly to avenge a robbery. In preliminary proceedings before the trial court, appellant asked the prosecutor for the "impeachable convictions" and "juvenile involvements" of these witnesses for use in impeaching their testimony. The prosecutor replied that he knew only of juvenile involvements, and that the government had no obligation to produce these

1. The trial of this case preceded our decisions in *Lewis, supra*, and *Smith, supra*.

2. In order to preserve confidentiality, the trial judge assigned the witnesses numbers in lieu of names. We refer to witnesses according to the numbers assigned. These numbers do not correspond to the order in which the witnesses testified.

records. The trial court agreed and declined to order production either before trial or at trial, when defense counsel renewed his request. *Id.*

In review of this ruling we noted that the Sixth Amendment requires the government, upon timely pretrial request, to lodge with the trial court records of all accessible delinquency adjudications that might be used to establish bias, leaving it for the trial court to decide whether an adjudication goes to bias and thus must be disclosed to the defense. *Id.* at 212; *see Lewis, supra*, 408 A.2d at 312; *Smith v. United States*, D.C. App., 392 A.2d 990 (1978).[1] We also pointed out that due process requires, upon request, similar production of juvenile adjudications affecting general credibility if they "are likely to be material to the outcome" of the trial. *Tabron, supra* at 212; *see Lewis, supra*, 408 A.2d at 312. We then held that the "trial court erred in assuming that the records of the juvenile adjudications need not be disclosed," *Tabron, supra* at 212, and instructed the trial court to assess the effect of the witnesses' criminal convictions and/or juvenile adjudications, if any, "in accordance with the guidelines of *Lewis, supra.*" *Tabron, supra* at 212.

## II.

We consider, first, those government witnesses susceptible to impeachment for bias. Preliminarily, we note that this category is not limited to witnesses who had a relationship with the court at the time of trial. Witnesses impeachable for bias include all those who had a relationship with the court, such as probation, at the time the government was in touch with them during investigation, prosecution, and trial of the crime. All five witnesses fit within this category.[2]

At the time of trial, witness number 1 was on probation for an impeachable juvenile offense, receiving stolen property. Witness number 4 was incarcerated for robbery, reflecting revocation of "aftercare status" attributable to an earlier juvenile adjudication for simple assault. Previously, this witness had been adjudicated a delinquent for sodomy.

In order to assess the impact of limiting cross-examination for bias, the court first must assess the extent of the curtailment. In *Springer, supra* at 856, we distinguished between the effects of total curtailment and a limitation imposed after some cross-examination. We held that in the former situation, curtailment will constitute per se reversible error because the jury will have had no opportunity to evaluate possible bias. In the latter situation, however, this court will review for harmless error under the constitutional standard set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (harmless beyond a reasonable doubt).

Appellant argues for per se reversible error here. We disagree. The trial court found, and the record reflects, that defense counsel cross-examined these five witnesses extensively about their active involvement in the crime for which appellant was on trial. This cross-examination effectively highlighted their motive to curry favor with the government, in order to avoid prosecution for the same crime. Accordingly, the *Chapman* harmless error test applies. *See Springer, supra* at 856.

We have said that, to justify a harmless error ruling, "it must be clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony" *Id.* (citation omitted). The first element of this test is applied when it is not possible to determine what facts defense counsel would have elicited upon further cross-examination. The second element is applied in cases, such as this one, when the excluded testimony is available for court review.

Normally, on review of the trial court's determination after remand, we would base our ruling on whether the trial court was clearly erroneous. Appellant argues, however, that the trial court failed to apply the proper test because it determined whether cross-examination as to bias "would have changed the outcome of the trial," not whether it would have "weaken[ed] the impact of the witness[es]' testimony." We agree that it is not clear whether the trial court used the proper test, particularly as to the witnesses who were not on probation at the time of trial but were on probation earlier, during key stages of investigation and prosecution. We conclude, however, that the court's factual findings are sufficiently explicit for this court to resolve the appeal. We conclude, beyond a reasonable doubt, that additional cross-examination about probation and other connections with the court, in an effort to show bias, would not have weakened the impact of the five witnesses' testimony.

More specifically, defense counsel ably highlighted the witnesses' motivation to point a finger at appellant in order to curry favor with the government and thus save their own skins. Witness number 1, who—unknown to the jury—was on probation for receiving stolen property at the time of trial, *see* note 2 *supra*, admitted on cross-examination that he possessed marijuana on the date of the shooting, that he carried the sawed-off shotgun present at the scene of the crime and later found under appellant's bed, and that he was standing beside appel-

Although the court did not have jurisdiction over witness number 2 at the time of trial, he made a statement to a detective investigating this case the day after the shooting while the witness was on probation for a juvenile adjudication for robbery. His probation expired June 14, 1976, about four months after he gave the statement. Similarly, witness 3 gave a statement to a detective while on probation for indecent liberties and simple assault. His probation extended to December 16, 1976, a little more than one month before appellant's trial. Witness number 5, who also spoke to detectives, was on probation until December 16, 1976 for juvenile adjudications for armed robbery, assault with a dangerous weapon, and carrying a dangerous weapon. These three witnesses' connections with the court during the period of investigation and prosecution were sufficient to provide a basis for cross-examination as to bias. More specifically, a witness may make statements to an investigator while on probation, in order to curry favor, and then be called to testify after probation is ended. The witness may feel compelled to stick to his original story, without regard to the truth, in order to avoid inconsistencies that could lead to a charge of perjury.

lant at the time of the shooting. The witness also admitted that he was not charged with any crime growing out of the incident. The trial court found, and we agree, that if all this evidence was not enough for the jury to infer bias based on the witness' desire to protect himself against prosecution for involvement with the crime, it is "highly unlikely that they would have inferred [bias] for the additional reason that the witness was looking over his shoulder at his probationary status." Beyond any reasonable doubt, disclosure of this witness' probationary status to the jury, with attendant cross-examination, would not have weakened the impact of his testimony. *Springer, supra* at 856.

On cross-examination, witness number 2 admitted that he took part in planning two attempted robberies, was standing next to appellant at the time of the shooting, had possession of the rifle and sawed-off shotgun after the shooting, and, along with appellant, was a victim of the robbery by the decedent that constituted appellant's motive for the shooting. The witness also admitted that he was not charged for any crime based on these activities. Cross-examination at trial illustrated the witness' motive to avoid prosecution by placing blame on appellant and cooperating with the government. Beyond a reasonable doubt, cross-examination concerning this witness' probation for a 1970 robbery, *see* note 2 *supra*, would not have further weakened the impact of his testimony.

Witness number 3 admitted on cross-examination that he was smoking marijuana on the day of the shooting, participated in both attempted robberies, was standing beside appellant at the time of the shooting, and, after the shooting, carried the gun. This witness further admitted that the day after the shooting he gave a three-page statement to the police in which he failed to disclose numerous facts showing the extent of his involvement with the crime. Given these admissions, it is clear beyond a reasonable doubt that his testimony would not have been susceptible to further impeachment if the jury also had learned he was on probation for indecent liberties at the time

of his statement to the police. *See* note 2 *supra.*

Although witness number 4 still was technically in "community aftercare" (because of a simple assault adjudication) at the time he testified, that status in effect had been revoked, for, as he told the jury, he was living at the Arlington County Jail. *See* note 2 *supra.* His very incarceration, therefore, reflected a strong reason to curry favor with the government. Additionally, this witness admitted that he had carried the shotgun and the rifle and earlier had participated with appellant and the other witnesses in two attempted robberies. He also testified he had told a friend that, in order to protect himself, he planned to say that appellant had shot the decedent. Beyond a reasonable doubt, cross-examination about this witness' previous adjudication as a juvenile offender would not have weakened the impact of his testimony beyond the bias inherent in the other evidence elicited from him.

Finally, witness number 5 admitted that, on the day of the crime, he had participated with appellant and the others in the two attempted robberies and had carried at least a part of one of the weapons to the hill where the shooting occurred. The government did not prosecute this witness for his involvement, although initially the government did charge him with the shooting. At that time, witness number 5 stated that he had not seen who did the shooting, but, at the grand jury hearing after the prosecutor had dropped the charges against him, this witness stated that he had seen appellant shoot the decedent. At trial appellant's counsel highlighted this sequence of events and thus the witness' motive for changing his story. There can be no reasonable doubt: cross-examination intended to elicit bias attributable to probationary status for armed robbery and weapons offenses, *see* note 2 *supra*, would not have weakened this witness' testimony beyond what the defense already had achieved through admissions from the stand.

We turn to the trial court's conclusion that cross-examination of these five witnesses concerning their juvenile adjudications "would not have made any difference in the outcome of the trial." This inquiry focuses on the effect that knowledge of a witness' past criminal record would have on the witness' general credibility rather than on the witness' specific motive to lie in order to protect himself. In making this determination the court had to inquire whether disclosure of the prior adjudications "might have affected the outcome." *Lewis, supra,* 408 A.2d at 306; *see id.* at 312. The court must determine whether a reasonable jury could have arrived at a different outcome, not what the trial court itself would have concluded as trier. The trial court's conclusion that disclosure of prior adjudications "would not have made any difference in the outcome of the trial," therefore, means that, given the other evidence at trial, no reasonable jury could have been swayed to acquit as a result of impeachment based on those adjudications.

We hold that the trial court's findings and conclusions are not clearly erroneous. We sustain the trial court's denial of a new trial and thus affirm appellant's convictions.

*So Ordered.*