Dwayne JOHNSON, a/k/a Wayne
Johnson, Appellant,

v.

UNITED STATES, Appellee.

No. 86–521.

District of Columbia Court of Appeals.

Argued June 17, 1987.
Decided Feb. 5, 1988.

Thomas T. Heslep, Washington, D.C., appointed by the court, for appellant.

Larry R. Parkinson, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Helen M. Bollwerk and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN and BELSON, Associate Judges, and GALLAGHER, Senior Judge.

BELSON, Associate Judge:

In this appeal from his convictions for assault with a dangerous weapon and carrying a pistol without a license, D.C.

Code §§ 22–502, –3204 (1981), appellant contends that the government's failure to disclose the juvenile record of one of its witnesses deprived him of his sixth amendment right to confrontation. In light of *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) and *Pennsylvania v. Ritchie*, —— U.S. ——, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), we hold that such a failure is not a confrontation clause violation. Nor, on the facts of this case, was the witness' juvenile record such as to raise a reasonable probability that its disclosure would have led to a different outcome at trial; thus, the government's failure to disclose the record did not violate appellant's due process rights as defined by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We also reject appellant's arguments that the trial court abused its discretion by improperly restricting defense counsel's closing argument or by denying his motion for a new trial.[1] We therefore affirm appellant's convictions.

## I.

Appellant's convictions arose from the beating and shooting of Everett Barber, apparently in retribution for Barber's failure to repay appellant and his brother for a drug debt. Barber testified that the two brothers first threatened him that "something was going to happen" if he did not pay them the money he owed. Barber saw appellant's brother hand appellant a gun, then remove a baseball bat from appellant's car. Appellant's brother began hitting Barber on the shoulder with the bat; while the two men struggled, Barber was shot in the buttocks. A total of seven eyewitnesses, six of whom were minors, testified and corroborated Barber's version of the events.

Appellant denied having been present at the scene of the assault. In addition to presenting alibi evidence, defense counsel sought to undermine the credibility of the government witnesses by eliciting testimony that the prosecutor had exerted pressure on them to testify at appellant's trial. The witnesses readily admitted that they had been reluctant to testify, but denied that the prosecutor had told them what to say in court. A jury found appellant guilty of assault with a dangerous weapon and carrying a pistol without a license, D.C. Code §§ 22–502, –3204 (1981). This appeal followed.

## II.

∎ Appellant first argues that he was denied his sixth amendment right to confront witnesses because the prosecutor failed to disclose the juvenile record of one of the government witnesses.[2] The witness had been adjudicated a delinquent on a charge of burglary, and had been placed on probation for that offense. The witness' probation was revoked, however, and he was placed in custody at a juvenile facility for thirty days. The day before his custody began, the witness was charged with another offense. As a result, when the witness' thirty-day commitment for burglary expired, he remained in custody pending further proceedings on the subsequent charge.

It is not clear from the record whether the witness first spoke with the prosecutor about appellant's case while he was in cus-

---

1. Appellant also argues that the trial court erred in denying his motion to suppress his post-arrest statement made to police. Since the police detective's responses to appellant's questions were not "reasonably likely to elicit an incriminating response," they did not constitute custodial interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnote omitted); *Bowler v. United States*, 480 A.2d 678, 680 & n. 4 (D.C.1984). Appellant's subsequent statement to the detective was therefore admissible despite the detective's failure to inform him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

2. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. Amend. VI. This right "means more than being allowed to confront the witnesses physically"; rather, "'[t]he main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination.*'" *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, Evidence § 1395 at 123 (3d ed. 1940)) (emphasis in original).

tody consequent to revocation of the burglary probation, or thereafter while he was being held on his subsequent charge. In any event, by the time the witness testified in front of the grand jury, he was in custody on the subsequent charge. That charge was dismissed by the government after the witness' grand jury testimony, but before his testimony at appellant's trial.

In that he did not have access to the witness' juvenile record, appellant argues, he was deprived of his sixth amendment right to cross-examine the witness about his potential bias in testifying. Specifically, appellant argues that he was denied the opportunity to explore whether the witness may have cooperated with the prosecution, and possibly lied, in order to get the government to drop his pending charges.

While appellant's position finds support in earlier precedent from this jurisdiction, the sixth amendment basis for his argument has been undermined by *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Prior to *Bagley*, in *Lewis v. United States*, 408 A.2d 303 (D.C.1979) ("*Lewis II*"), aff'g on rehearing, 393 A.2d 109 (D.C.1978) ("*Lewis I*"), we had distinguished between evidence of a witness' juvenile adjudications that imply the witness' *bias* against the accused, and evidence of adjudications that merely reflect on the witness' general credibility. *Id.* at 312.[3] In the case of the former, *i.e.*, when the juvenile proceedings reflect on the witness' bias, we subsequently held that the confrontation clause requires the prosecutor to disclose the record of those proceedings to the defense. *See Tabron II, supra* note 3, 444 A.2d at 943; *Tabron v. United States*, 410 A.2d 209, 212–13 (D.C.1979) ("*Tabron I*"); *cf. Davis, supra* note 2, 415 U.S. at 316–19, 94 S.Ct. at 1110–11 (state's interest in confidentiality of juvenile proceedings outweighed by defendant's sixth amendment right to cross-examine witness as to possible bias).

In *Bagley*, however, the Supreme Court apparently rejected a similar line of reasoning advanced by the United States Court of Appeals for the Ninth Circuit.[4] In that case, the prosecutor had failed to disclose evidence of the "deals, promises or inducements made to witnesses in exchange for their testimony," as requested by the defense. 473 U.S. at 669–70, 105 S.Ct. at 3377. Because such deals, promises or inducements might implicate the witnesses' bias, the circuit court reasoned, the prose-

---

**3.** The juvenile proceedings reflect on the witness' bias when the witness "could have reason to curry favor with the government[,]" such as when he or she is on probation at the time of trial. *Lewis II, supra*, 408 A.2d at 308. Bias is suggested not only when the witness has a relationship with the court at the time of his or her testimony; "[w]itnesses impeachable for bias include all those who had a relationship with the court ... *at the time the government was in touch with them during investigation, prosecution, and trial of the crime.*" *Tabron v. United States*, 444 A.2d 942, 943 (D.C.1982) ("*Tabron II*") (emphasis added).

In the instant case, when the witness appeared before the grand jury considering charges against appellant, he was detained in Oak Hill, a facility for delinquent youths. The charges for which he was detained were dropped shortly thereafter. Thus, under *Tabron II*, the witness' involvement with the juvenile court during the investigation of appellant's case provided a "reason to curry favor with the government," *Lewis II, supra*, 408 A.2d at 308, and made it incumbent upon the prosecutor to disclose the juvenile record to the defense. *Tabron II, supra*, 444 A.2d at 943; *see Lewis II, supra*, 408 A.2d at 312.

We note that in *Tabron II* we followed the rule of *Springer v. United States*, 388 A.2d 846 (D.C.1978), to determine whether the failure to produce records relating to bias required reversal. In *Tabron II*, we explained that *Springer* had distinguished between total curtailment of cross-examination and a limitation imposed after some cross-examination. *Springer* held that in the former circumstances, curtailment would constitute per se reversible error on the theory that the jury would have had no opportunity to evaluate the witness' possible bias. In the latter circumstance, however, this court would consider whether the error was harmless beyond a reasonable doubt. *Tabron II, supra*, 444 A.2d at 944. The Supreme Court recently made clear, however, that violations of the sixth amendment confrontation clause do not call for reversal if they are harmless beyond a reasonable doubt under the test of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 684, 106 S.Ct. 1431, 1436, 1438, 89 L.Ed.2d 674 (1986); *see Bassil v. United States*, 517 A.2d 714, 717 & n. 5 (D.C.1986); *Brooks v. United States*, 516 A.2d 913, 916 (D.C.1986).

**4.** 719 F.2d 1462 (9th Cir.1983).

cutor's failure to disclose them violated the defendant's right to confront adverse witnesses, and required automatic reversal.[5] *Id.* at 674, 105 S.Ct. at 3379. The Supreme Court, however, eschewed a sixth amendment analysis, rejecting "any such distinction between impeachment evidence and [other] exculpatory evidence." *Id.* at 676, 105 S.Ct. at ——. The Court distinguished *Davis, supra* note 2, in which the trial court had prohibited defense counsel during cross-examination from asking questions that specifically referred to the witness' juvenile record. Bagley's deprivation, on the other hand,

> [did] not involve any direct restriction on the scope of cross-examination. The defense was free to cross-examine the witnesses on any relevant subject, including possible bias or interest resulting from inducements made by the Government. The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination.

*Id.* at 678, 105 S.Ct. at 3381. Thus, the Court indicated that the sixth amendment protects a defendant's right to question witnesses, but not necessarily to receive from the government specific material with which to question them.

A plurality of the Court recently reaffirmed this distinction in *Pennsylvania v. Ritchie,* —— U.S. ——, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). In that case, a state agency had refused to produce for the defense a child abuse victim's file that was subject to a statutory privilege. *Id.* at ——, 107 S.Ct. at 994. Four members of the Court disagreed with the Pennsylvania Supreme Court's conclusion that, by denying him access to the file, the trial court

had violated the defendant's right to confront adverse witnesses. *Id.* at ——, 107 S.Ct. at 996, 1000 (plurality). Stressing that "the right of confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination[,]" the plurality refused "to transform the Confrontation Clause into a constitutionally-compelled rule of pretrial discovery." *Id.* at ——, 107 S.Ct. at 999 (emphasis in original). Since "[n]ormally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses[,]" and since the trial court had allowed the defendant to cross-examine the victim, no sixth amendment violation had occurred. *Id.* at ——, 107 S.Ct. at 999–1000.[6]

*Bagley* and *Ritchie* compel us to conclude in the instant case that, since appellant was not prohibited from cross-examining the witness about his juvenile involvement or motive for testifying, his right of confrontation was not violated. To the extent that *Lewis II,*[7] *Tabron I,* and *Tabron II* hold to the contrary, they have been effectively overruled by *Bagley* and *Ritchie.*

■ Neither *Bagley* nor *Ritchie* ends its analysis of the government's failure to disclose with a rejection of the defendant's sixth amendment claim, however. Rather, those opinions go on to discuss whether, more generally, the government's failure to disclose exculpatory evidence, *viz.,* the witness' potential bias, deprived the defendant of due process under the fifth or fourteenth amendment. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). We thus turn to the question of whether, under *Brady* and its progeny, appellant was deprived of a fair

---

5. *Van Arsdall, supra* note 3, which rejected automatic reversal for confrontation clause violations in favor of a "harmless beyond a reasonable doubt" standard, had not yet been decided. *See* 475 U.S. at 684, 106 S.Ct. at 1438.

6. This reasoning of the plurality of four was rejected by Justice Blackmun, the author of *Bagley,* in an opinion concurring in the judgment. Two other justices (Justices Brennan and Marshall) expressed their disagreement with the

plurality's confrontation clause analysis, and the remaining two justices (Justices Stevens and Scalia) expressed no view, as they deemed the court without jurisdiction over the case.

7. Our holding in *Lewis II* was expressly grounded on due process considerations. We referred to the confrontation clause only in recognizing our holding in *Smith v. United States,* 392 A.2d 990 (D.C.1978).

trial by the prosecutor's failure to disclose the witness' juvenile record.[8]

In *Brady,* the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Id.*

A majority of the court in *Bagley* elaborated upon the *Brady* materiality test as follows: "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley, supra,* 473 U.S. at 682, 685, 105 S.Ct. at 3384, 3385. Applying the *Brady* materiality analysis, the *Bagley* majority held that in the case before it the government's failure to disclose evidence of the witness' potential bias denied the defendant due process only if it "deprive[d] the defendant of a fair trial ... in the sense that its suppression undermine[d] confidence in the outcome of the trial." *Id.* at 678, 105 S.Ct. at 3381 (*citing United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976)). We apply *Bagley's* materiality standard equally to undisclosed juvenile records that would have facilitated bias impeachment of a witness, and to those that reflected only on the witness' general credibility. *See Tabron II, supra,* 444 A.2d at 943 (due process requires production of juvenile adjudications affecting general credibility if likely to be material to outcome of trial). Here, the witness' undisclosed records contain both types of impeachment evidence: in addition to his pending charges and their subsequent dismissal, the witness also had a juvenile adjudication for burglary, an offense that could have been used to impeach his general credibility. *See* D.C.Code § 14–305(b) (1981).

Having examined the witness' juvenile records in light of the record in this case, we are convinced that there is no "reasonable probability" that their production would have affected the outcome of appel-

lant's trial. Significantly, the potential bias of the witness was not concealed from the jury: when defense counsel asked him whether the government had told him "something that changed [his] mind" about his initial reluctance to testify, the witness admitted that he was afraid of getting "locked up" if he did not testify. Furthermore, the witness himself mentioned the fact that he had been "locked up at Oak Hill" when he first spoke with a policeman about appellant's case, thus allowing the jury to infer that he may have had a personal motive to cooperate with the government. *Cf. Tabron II, supra,* 444 A.2d at 945 (jury exposed to witness' "strong reason to curry favor with the government" by his own testimony that he was "living at the Arlington County Jail"). We also note that defense counsel was put on notice during trial of the witness' juvenile custody, as well as the fact that the charges for which he was in custody were subsequently dropped; thus, this is not a situation where the defense may have "assume[d] from the nondisclosure that the evidence [did] not exist," and altered his trial strategy accordingly. *Bagley, supra,* 473 U.S. at 682–83, 105 S.Ct. at 3384.

It is also unlikely that the disclosure of the witness' adjudication of delinquency for burglary would have affected the outcome of the trial. The witness in question was one of seven eyewitnesses, in addition to the victim, each of whom testified positively to appellant's participation in the assault, and four of whom testified to his possession of the gun. Again, the jury was exposed to a possible "taint" on the witness' credibility by his own testimony that he had been "locked up at Oak Hill." In light of the government's strong evidence against appellant, and both the jury's and defense counsel's independent awareness of the circumstances implying the witness' bias and questionable credibility, we find no reasonable probability that disclosure of

---

8. Although appellant did not specifically raise a *Brady* claim on appeal, we address this issue because the interrelation of the right to production under the sixth amendment and that under *Brady* was implicit in the *Lewis/Tabron* line of cases. *See Lewis I, supra,* 393 A.2d at 118 (under reasoning of *Davis v. Alaska,* juvenile records may constitute suppressed *Brady* material).

the witness' juvenile records would have affected the outcome of appellant's trial. Since those records were not "material" in the sense that term is used in *Bagley* either to guilt or punishment, the government's failure to disclose them does not require reversal.

## III.

■ Appellant next argues that the trial court abused its discretion by improperly limiting the scope of his closing argument. Specifically, the court sustained objections to defense counsel's statements that the government witnesses had tailored their testimony to meet the prosecutor's approval. As appellant points out, it was the prosecutor herself, during closing argument, who first broached the subject of improper government pressure on the witnesses:

> Now, ladies and gentlemen, when [defense counsel] stands up to give his closing argument, he might try and tell you that it wasn't these witnesses that were out to get [appellant] Wayne Johnson, it was the police, it was the detectives, it was the Government, they somehow wanted to finger Wayne Johnson for a crime he didn't commit because they had something against him.
>
> \*   \*   \*   \*   \*   \*
>
> There is ... no evidence in this case that any eyewitnesses, any of those kids from Kenilworth ever pointed a finger at Wayne Johnson or Sonny Johnson [appellant's brother] because they were coerced or pressured to do so. What was the evidence? Some of those witnesses told you that when they first came down to the grand jury, they didn't want to be involved, and there is evidence from Detective Leadmon and from some of those witnesses that some of them had to be reminded of their civic duty, and those witnesses were told you really don't have a choice about whether to testify in this case, and the witnesses were also told what the penalties for not testifying were, refusing to testify, what the penalties for perjury were, and at least one of those witnesses told you that she felt

pressured to testify.... But the pressure to testify isn't pressure to testify in any particular way. Did any of those witnesses ever tell you that anyone told them what to say; that anyone told them to point the finger at anyone in particular? Absolutely not. All of those witnesses told you, "I knew I had to testify but no one told me what to say, no one told me whose picture I had to pick out, no one told me who I should say did this crime, no one told me what to say in court.["]

The prosecutor's argument is supported by the witnesses' testimony: the witnesses did admit their reluctance to testify, and several said that they testified because they were afraid they would be prosecuted for perjury if they did not do so. While the witnesses readily admitted having gone over their testimony with the prosecutor, however, they consistently denied having been told what to say in court. Thus, the prosecutor appropriately drew the jury's attention to the witnesses' denial that the pressure they had received to testify extended to the substance of their testimony.

In contrast, defense counsel's closing argument suggested precisely the sort of substantive coaching for which the record contained no support. First, in referring to a discrepancy in a witness' estimate of his distance from the assault, defense counsel asked rhetorically, "Why would [the witness] shorten up that distance? Because if he didn't, he was afraid, as were other witnesses, that the Government would come after him.... [t]hat the Government may prosecute him for perjury." Second, referring generally to the government witnesses, defense counsel argued "that it is clear from their testimony, clear that when they came to the grand jury, they knew who was being prosecuted and they knew, whether they were told or not, clearly they knew what sort of evidence was going to be favorably received." Finally, counsel admonished the jury,

> "You have seen what the Government can do to make a case to bring into court. You have seen the dangers of that with the best of motives. Something can be

brought in and a youngster can be made certain. [']I'd better be certain. Why, yes, it was this guy.[']"

The trial court sustained the prosecutor's objections to each of these statements.

We reject appellant's argument that the prosecutor "opened the door" to the subject of the witnesses' substantive coercion in her own closing argument. *Cf. Byrd v. United States,* 364 A.2d 1215, 1217–18 (D.C.1976) (prosecutor's reference to defendant's failure to testify did not require mistrial when confined to rebuttal of defense counsel's closing argument). The government's accurate statement that the witnesses had denied substantive coercion does not justify in response an inaccurate suggestion that there was evidence to support such coercion. Defense counsel's insinuation that the government had coerced the witnesses to testify in a certain way was not based on "reasonable inferences" drawn from the testimony of record. *See Wesley v. United States,* 233 A.2d 514, 517 (D.C.1967). By pursuing such arguments, defense counsel, in effect, was himself testifying to a sequence of events of which no evidence had been presented at trial. *See Jones v. United States,* 516 A.2d 513, 519–20 (D.C.1986). Accordingly, it was within the trial court's discretion to restrict appellant's argument. *See Smith v. United States,* 330 A.2d 519, 520 (D.C.1974).

In his brief and at oral argument, appellant urged that the evidence supported an inference of substantive coaching because several witnesses had used similar wording to describe the lighting of the scene of the assault. Appellant never proffered this basis for his argument at trial, however. As in *Wesley, supra,*

> there was no apparent reason why counsel could not have pursued his argument on this issue if he had confined himself to the testimony of record. That he did not choose to do so was a matter of his own judgment, not the result of any unwarranted interference of the trial judge.

233 A.2d at 517. Nor did the court prohibit counsel from making inferences from evidence that *had* been presented at trial:

> You can go into the pressure put on the witnesses. You can go into everything, but you cannot say that the Government —as a matter of fact, the evidence is to the contrary—that the Government told them ... anything other than that they had to testify.... You must confine yourself to what the facts are. You may argue that they were pressured, you may argue that they were young, you may argue that they felt concerned, but you cannot argue that the Government told them that they had to identify Wayne Johnson as the perpetrator of this offense.

When counsel restrained his argument accordingly, he was allowed to continue unhindered.[9] The trial court did not abuse its discretion in preventing defense counsel's argument from exceeding the bounds of the evidence presented.

## IV.

Finally, appellant argues that the trial court abused its discretion in denying his motion for a new trial, made within seven days of verdict, under Super.Ct.Crim.R. 33. Appellant's motion was based on three items of evidence not produced at trial: a signed written statement of Altimese Hall, a sworn written statement of Dennis Austin, and Austin's live testimony at a hearing on the new trial motion. Since both Hall's and Austin's statements and Austin's testimony asserted that the government had pressured them to testify at appellant's trial, appellant argues, they supported appellant's theory of government coercion. In addition, Austin's statement and testimony purported to exculpate appellant by stating that he had witnessed the assault, but did not see appellant there. The trial court denied appellant's motion.

9. Specifically, he stated:
   "Ladies and gentlemen, I want to make it clear that I do not intend to say that ... the Government fed these witnesses precisely what they were supposed to say. That is not the theory here. The theory is that the circumstances of this investigation made it tempting for these youngsters to be good Government witnesses."

Super.Ct.Crim.R. 33 provides in pertinent part:

The court on motion of a defendant may grant a new trial to him if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment.... A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the Court may fix during the 7-day period.

While a new trial on a motion made more than seven days after judgment is available only if evidence has been "newly discovered," the court may order a new trial on a motion made within seven days of verdict if it is "in the interest of justice." *Godfrey v. United States*, 454 A.2d 293, 299 (D.C. 1982); *see Sellars v. United States*, 401 A.2d 974, 979 (D.C.1979).

In *Godfrey*, the defendant moved for a new trial within seven days of verdict on the grounds that the complainant had recanted her testimony. We held that, in evaluating whether "the interest of justice" required a new trial, the trial court must first act "as a thirteenth juror" to determine whether the recantation was credible. *Godfrey, supra*, 454 A.2d at 299–300. Only if the court determines that the proffered evidence is credible need it evaluate the potential impact that that evidence would have if presented to a jury. *Id.*

In *Godfrey*, we noted that this jurisdiction had never decided the appropriate standard by which to evaluate potential jury impact when a Rule 33 motion is made within seven days of verdict. *Id.* at 301 n. 27. We then cited the two tests traditionally used to evaluate jury impact in the case of a new trial motion: (1) whether the recantation "would *probably* produce an acquittal in the event of a retrial," *Nowlin v. United States*, 382 A.2d 9, 14 n. 7 (D.C. 1978), or, more leniently, (2) whether it *might* have produced a different verdict, *see Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928). *Godfrey, supra*, 454 A.2d at 299–300 & nn. 21, 22.[10] We found it unnecessary to decide between these tests, however, because the trial court had found that the victim's recantation was "highly incredible and thus not a proper basis for a new trial." *Id.* at 300–01 (footnote omitted). Thus, since the court "as a thirteenth juror" had found the newly presented evidence not credible, it did not have occasion to evaluate its potential impact on a jury.

As in *Godfrey*, we need not decide here what test of jury impact should apply in determining whether "the interest of justice" calls for a new trial. In denying appellant's motion, the trial court noted that Austin had given differing versions of events in his written statement, in his grand jury testimony, and in his testimony at the new trial hearing. We do not find clearly erroneous the trial court's finding that Austin's testimony, and implicitly his written statement, were "highly incredible." As in *Godfrey, supra*, the trial court's discrediting of the proffered evidence made it unnecessary to evaluate its potential impact.

Turning next to Hall's statement, the trial court found that it was "merely cumulative and ... would have had no impact on the outcome of trial." This finding also is not clearly erroneous. Hall's statement represented that Hall was "not present" at the scene of the assault. While, in her statement, Hall asserted that a police detective exerted pressure on her to testify, she did not suggest that he pressured her to testify in a certain way.

---

10. The former standard, as stated in *Nowlin*, applies to motions for new trial based on "newly discovered evidence" made within two years after final judgment, and is part of what is commonly known as the *"Thompson–Heard"* criteria. *See Godfrey, supra*, 454 A.2d at 299 n. 18, 300 n. 21; *Heard v. United States*, 245 A.2d 125, 126 (D.C.1968); *Thompson v. United States*, 88 U.S.App.D.C. 235, 236, 188 F.2d 652, 653 (1951). The latter, *"Larrison"*, standard has been articulated by several federal courts in evaluating victim recantations and other evidence suggesting that the defendant had been convicted based on perjured testimony. *See, e.g., United States v. Wright*, 625 F.2d 1017, 1020 (1st Cir.1980); *United States v. Wallace*, 528 F.2d 863, 866 (4th Cir.1976); *Larrison, supra*, 24 F.2d at 87–88.

Thus, the statement would have been useful to appellant only insofar as it supported the extensive evidence already presented that the government witnesses had received pressure to testify. Accordingly, since the trial court found that Hall's cumulative statement would have had *"no impact"* on the trial, the statement would not have been grounds for a new trial under either the *Larrison* ("might have produced a different verdict") or the *Thompson–Heard* ("probably would have resulted in acquittal") test. We therefore affirm the denial of appellant's motion for a new trial.

*Affirmed.*

NEWMAN, Associate Judge, concurring:

I concur in Judge Belson's opinion for the court save for his holding based on his reading of *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and *Pennsylvania v. Ritchie*, —— U.S. ——, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). I do so based on the circumstances surrounding *Ritchie* as accurately set forth in note 6 of his opinion for this court. Since only four justices out of nine joined the section of *Ritchie* in question, I think it is still an open question whether the failure to disclose impeachable convictions, etc., implicate the confrontation clause as well as the due process clause. On the facts of this case, even applying a confrontation clause analysis, I vote to affirm.