**Javier CARD, Jerome Edwards, Antoine W. Rice, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 94–CF–754, 94–CF–801, 94–CF–1147.

District of Columbia Court of Appeals.

Argued Jan. 11, 2000.
Decided June 28, 2001.

Rudolph M. Kammerer, Washington, DC, appointed by the court, with whom Jeffrey T. Green, appointed by the court, was on the brief, for appellant Card.

Mindy A. Daniels, appointed by the court, for appellant Edwards.

Sandra K. Levick, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant Rice.

Barbara J. Valliere, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney, were on the brief, for appellee.

Before TERRY, STEADMAN and RUIZ, Associate Judges.

STEADMAN, Associate Judge:

During jury selection in a murder trial in 1993, one potential juror, a 33–year–old African–American male, had close cropped hair and was wearing a white shirt and bow tie. He was Juror 333. The prosecutor exercised one of his peremptory strikes against this juror out of expressed concern that the juror might be a follower of Louis Farrakhan. The principal issue on appeal is whether this exclusion was constitutionally discriminatory on the basis of religion in violation of the doctrine of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

We agree with the government that, because this potential reversible error was not fairly presented to the trial court, we can review only for "plain error." At the time, the *Batson* principle had been applied only to race discrimination, and indeed to this day the Supreme Court has not determined whether it extends to religion-related strikes. We can find no plain error here. In addition, although we do not condone the prosecutor's dilatory discovery compliance, we reject appellants' numerous assertions of reversible trial error and accordingly affirm the bulk of the convictions. We remand for the limited purpose of resentencing based on merged convictions.

## I. Factual Summary

This appeal stems from one of the lengthiest criminal trials in the history of the District of Columbia Superior Court.[1] It ended in the defendants' convictions on numerous counts of murder and other crimes. A detailed recitation of the facts, rather than elucidating the case, would serve only to obscure the issues on appeal. We therefore turn to a general description of the underlying events, and direct attention to the substantive discussions *infra,* wherein necessary particulars of the case and the trial are discussed.

The evidence adduced by the government at trial showed the following. Throughout the 1980's and 90's, appellant Card operated an illegal drug business with his partner, James Murray, in Southeast Washington. On October 28, 1990, Murray was murdered. The day after the murder, Card sought revenge, gathering loyal followers to avenge Murray's brutal demise. Convinced that Murray had been killed by a rival drug dealer named Billy Ray Tolbert, Card and his cohorts lured Tolbert to a Southeast apartment. Once there, Card and several of his followers— including appellants Edwards and Rice— participated in binding Tolbert's hands, feet, and mouth with duct tape, and repeatedly beating him. When Tolbert attempted to escape by jumping through the glass of a closed second story window, Card decided to kill Tolbert. Tolbert was shot several times at point blank range by Edwards and Card, among others. His body was then dropped out the window and eventually deposited in Tolbert's car, where it was later found. In the days following the murder, Card, Edwards, Rice, and others took pains to obstruct the investigation of Tolbert's murder, all the while continuing to seek revenge from oth-

1. The trial, from *voir dire* to verdict, lasted from September 7, 1993 to April 8, 1994 and is transcribed in 67 volumes totaling 18,127 pages.

er drug dealers who they suspected murdered Murray.

Forty-two witnesses testified on behalf of the government. Most important, for purposes of this appeal, were the following: Kalvin Bears, who testified that Card had admitted murdering Tolbert; Ida Stanford, who also testified that Card had acknowledged the details of the murder; Metropolitan Police Detective James Bradley, who testified regarding Edwards' inculpatory statements to police; Fred Johnson, who testified that he witnessed Card and others conspire to kill Tolbert, that on the night of the murder he heard Tolbert questioned repeatedly by Card, and that he heard the shots that killed him; Lewis Yancey, who testified that he supplied Card with guns used in the murder; and James Craille, who testified that Card had organized meetings with the appellants and other followers at which Tolbert's murder was planned, had supplied guns for the conspiracy, had lured Tolbert to the ambush, and had participated in the shooting. The defense strategy at trial was essentially to attack the credibility of these and the other witnesses. None of the appellants testified on his own behalf.

Card was convicted on seven counts, including conspiracy to commit murder (D.C.Code § 22–2401), felony murder (kidnaping) while armed (D.C.Code §§ 22–2401, –3202), and premeditated murder while armed (D.C.Code §§ 22–2401, –3202). Both Rice and Edwards were convicted on several counts, including kidnaping while armed (D.C.Code §§ 2101, –3202) and felony murder (kidnaping) while armed. All three were sentenced to lengthy prison terms, and now appeal.

## II. *Batson* Challenge

### A. Religious Discrimination

■■■ Appellants contend that the prosecutor violated the federal constitution by using a peremptory strike to exclude a juror solely on the grounds of his suspected religious affiliation,[2] and that the trial court committed *per se* reversible error[3] by allowing the strike. Appellants rely on *Batson, supra,* in which the U.S. Supreme Court held that a prosecutor's exclusion of even a single juror based on race, a classi-

---

**2.** Appellants necessarily distinguish between religious affiliation and religious belief. It is indisputable that a juror may be stricken on the basis of actual beliefs, religious or otherwise in origin, which would inhibit his or her ability to apply the law fairly in a given case (either because of reservations about that particular case or because of inherent incompatibility between the beliefs and jury duty). *See, e.g., United States v. Stafford,* 136 F.3d 1109, 1114 (7th Cir.) ("It would be proper to strike him on the basis of a belief that would prevent him from basing his decision on the evidence and instructions, even if the belief had a religious backing."), *modified on other grounds,* 136 F.3d 1115 (7th Cir.), *cert. denied,* 525 U.S. 849, 119 S.Ct. 123 (1998).

**3.** Harmless error analysis does not apply to unconstitutional discrimination during the jury selection process. *See Arizona v. Fulminante,* 499 U.S. 279, 294, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (stating that racial dis-

crimination in grand jury selection "struck at fundamental values of our society and 'undermined the structural integrity of the criminal tribunal itself, and [was] not amenable to harmless-error review'") (quoting *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)); *see also Tankleff v. Senkowski,* 135 F.3d 235, 248 (2nd Cir.1998) (finding harmless error analysis inapplicable); *Ford v. Norris,* 67 F.3d 162, 170 (8th Cir. 1995) (same); *Rosa v. Peters,* 36 F.3d 625, 635 n. 17 (7th Cir.1994) (same); *Ramseur v. Beyer,* 983 F.2d 1215, 1225 n. 6 (3rd Cir.1992) (same), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). *Cf. Sams v. United States,* 721 A.2d 945, 951 (D.C.1998) (applying harmless error review where defendant alleged that the trial court interfered with his own use of peremptory strikes), *cert. denied,* 528 U.S. 1135, 120 S.Ct. 977, 145 L.Ed.2d 928 (2000).

fication subject to strict scrutiny, violates equal protection.[4] This holding was extended to a juror's gender, a classification subject to intermediate scrutiny, in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Like race, religion is a classification subject to strict scrutiny. *See Employment Div. v. Smith*, 494 U.S. 872, 886 n. 3, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). However, neither this court nor the Supreme Court has ever considered whether a peremptory strike based on religious affiliation violates the Constitution. *See Davis v. Minnesota*, 511 U.S. 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994) (denying certiorari on this precise issue). The government contends that since this argument was not fairly presented to the trial court, our review should be limited to plain error. We address this scope of review issue first.

■■■ "In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort." *Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967). "Objections must be made with reasonable specificity; the judge must be fairly apprised as to the question on which he [or she] is being asked to rule." *Hunter v. United States*, 606 A.2d 139, 144 (D.C.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444

(1992). Accordingly, we have long applied the rule that "[q]uestions not properly raised and preserved during the proceedings under examination, *and points not asserted with sufficient precision to indicate distinctly the party's thesis*, will normally be spurned on appeal." *Womack v. United States*, 673 A.2d 603, 612 (D.C. 1996) (quoting *Miller, supra*, 127 U.S.App. D.C. at 369–70, 384 F.2d at 321–22) (emphasis in original), *cert. denied*, 519 U.S. 1156, 117 S.Ct. 1097 (1997).

■■■ Taking into account all the facts and circumstances, we conclude that appellants failed to raise a constitutional challenge to the prosecutor's religious-affiliation-based strike with sufficient precision to fairly apprise the trial court of the constitutional question before it. The somewhat complicated facts bearing on that question are as follows.

■■■ Jury selection in the instant case took place in 1993, at a time when neither this court nor the Supreme Court had applied *Batson* to any category other than race. Each side was given twenty-four peremptory strikes, which they began to exercise on a Wednesday morning after a month of jury selection. By lunchtime, the prosecution had used six strikes, three of them against black males under thirty years of age. Using this fact as evidence of a *prima facie* case, and arguing that the three young black male defendants would not be able to get a "jury of their peers," appellants' counsel[5] made a *Batson* objec-

---

**4.** Before *Batson*, a defendant had to show "systematic exclusion" of members of his or her own race. *See Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In holding that exclusion of a single juror violated equal protection, *Batson* signaled the Supreme Court's analytic shift from a criminal defendant's right to a fair jury to a potential juror's right of access to an important indicium of citizenship. *See Batson, supra*, 476 U.S. at 79, 106 S.Ct. 1712. Consistent with that shift, the Supreme Court has since ruled that *Batson* extends to jurors of a

different race from the defendant, *see Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); civil suits, *see Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); and peremptory strikes by the defendant, *see Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

**5.** There were six defendants in the case at the time of jury selection, each with his or her own counsel, but only three of the defendants are involved in this appeal. (Mistrials were

tion to the exclusion of "black jurors and in particular young black male jurors." Under *Batson*, "once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Accordingly, the trial court asked the prosecutor to offer explanations for the three challenged strikes. The prosecutor did so, stating, in part, that he typically sought jurors who were employed or in school. The trial court concluded that there was no *Batson* violation, and the peremptory strike process resumed.

The government completed its peremptory strikes on Wednesday afternoon, exercising three more of them to eliminate black male jurors. These jurors were ages twenty-two, thirty-three, and thirty-six, respectively, and two of them were employed. The second of these strikes was of Juror 333. At the end of the day, counsel renewed the *Batson* objection, arguing that the prosecutor's strikes of employed black males exposed the race-neutral explanation he had given earlier for

striking black males as a mere "pretext" for racial discrimination. Argument on this point continued into the Thursday morning session. Throughout, defense counsel consistently stressed that the objection was not to any particular strike but rather to systematic exclusion of black males "overall" and the "net effect of the entire pattern and practice." As an example, however, counsel cited stricken Juror 333 as a good citizen with whom the "only thing wrong ... is that he is a young, black man."

After some debate about inclusion of the thirty-three and thirty-six year-old jurors in the "young black male" category, resolved in favor of inclusion by the trial court, the court asked the prosecutor to explain the three most recent strikes of young black males. As to Juror 333,[6] a thirty-three year old employed black male and the subject of the only strike at issue in this appeal, the prosecutor explained that he had stricken Juror 333 because, although there was "no indication on the record" of his religious or political affiliation, the fact that Juror 333 had close cropped hair and was wearing a white shirt and bow tie suggested to him that Juror 333 might have an "affiliation with those people who follow Louis Farrakhan who could not be fair to the Government."[7]

declared as to two of the remaining defendants, and a third was acquitted.) Since objections of each counsel were adopted by all other counsel, we need not distinguish for purposes of this appeal which counsel made which objection.

6. *As to the other two stricken venirepersons,* the prosecutor stated that, based on voir dire questioning, he did not believe that one could be fair, while the other had admitted that he would not be able to follow the law as it related to conspiracy charges.

7. It is asserted that Louis Farrakhan, the leader of the Nation of Islam, both (1) encour-

ages members of the religion to maintain an appearance similar to that of Juror 333, and (2) has personally expressed the view that black jurors should generally not convict black defendants. The government urges a distinction between political and religious beliefs in this case. The Arizona Supreme Court has recently suggested that the non-religious characteristics of an objectively religious venireperson may legitimately form the basis of a peremptory strike. *See State v. Martinez*, 196 Ariz. 451, 999 P.2d 795, 800 (2000) ("The State did not strike Mr. Veitch because he was Christian. Rather, the State struck Mr. Veitch because of his occupation as a pastor

The explanations complete, the trial court turned its attention back to defense counsel. Appellants' counsel urged that the *Batson* inquiry be extended to black women, which the court overruled finding no *prima facie* case, but counsel made no mention whatsoever of the prosecutor's explanation for striking Juror 333. As to the existing *Batson* challenge, the trial court ruled that it had found no "racially based systematic exclusions of young, black males from the jury." The court reasoned that all but one of the strikes, *i.e.* the strike of Juror 333, were based on race-neutral "facts, observations, and information and responses obtained during the voir dire." Although it found no such objective basis for the strike of Juror 333, referring to the justification of that strike as "less than acceptable" and being based solely on the prosecutor's "gut feeling," the court concluded that one strike based on "gut feeling" did not establish systematic exclusion, nor was it race-based. At the same time, the trial court expressed understanding for the prosecutor's concern about jury nullification by a Farrakhan follower based on its own experience with jurors refusing to convict.

The peremptory strike process then continued, apparently because some defense strikes remained at the time of the renewed *Batson* challenge. Once complete, counsel again "renewed" the *Batson* challenge, this time on the ground that Juror 1, who had since been seated, had closely cropped hair and had worn a bow tie on both days of the peremptory strike process. When the trial court asked how the *Batson* objection could be renewed when the prosecutor had not stricken Juror 1, counsel clarified the theory as being that

the prosecutor's stated basis for striking Juror 333 (*i.e.* affiliation to Louis Farrakhan) was really just a "pretext" for striking young black males. Counsel explained that the prosecutor had stricken Juror 333 but not Juror 1, "another person in the exact same situation with close cropped hair, bow tie, unemployed but just older. It was clearly age v. age, sex, and race." The trial court responded, "Counsel, I have already heard the *Batson* challenges with respect to all of the jurors that were struck." Soon thereafter, the court asked all counsel whether there was "any reason" not to excuse the unselected voir dire panelists, and counsel unanimously indicated there was not. The unselected panelists were dismissed, and the court addressed the selected jury regarding scheduling and such, then dismissed them for lunch. The jury had not yet been sworn.

At this point, appellants' counsel indicated that there were still issues concerning jury selection. They referred to the previous *Batson* objection to strikes of young black males and offered the opinion that two Wednesday morning strikes of unemployed young black males were "improper." However, the paramount issue, as stated by counsel, was the prosecutor's inability to offer "what I believe that the court perceived as a proper explanation" for striking Juror 333. That counsel then made the following statement, which we quote almost in its entirety since appellants' *Batson* claim rests on it:

> [The prosecutor] stated that his gut reaction and the court accepted it and I believe that the court indicated something to the effect of yes, he had close cropped hair and he did have a bow tie

and because 'he's strongly opposed to the death penalty.' ... Had Mr. Veitch been a social worker and had the State struck Mr. Veitch because social workers are forgiving, there would have been no question about the

validity of the strike."), *cert. denied,* ―― U.S. ――, 121 S.Ct. 320, 148 L.Ed.2d 257 (2000). Nevertheless, for purposes of this appeal we may assume that the political and religious views ascribed to Juror 333 were inseparable.

and that we had juries—cases before which ended in 11 to 1, basically a hung jury. Your honor, Juror Number 1 ... has close cropped hair. He has a bow tie. He had a bow tie on yesterday.... Your honor, that undercuts [the prosecutor's] argument. He is saying that he struck the Juror because he is Muslim and I think first of all, that's improper. It is improper and I was also shocked when the court condoned that statement, your honor. What the court is suggesting is that people of the Muslim religion or the Muslim practice cannot be fair and impartial. Your honor, I was shocked that the court joined in that comment. [The prosecutor] represents the government and those may be his personal thoughts. But, your honor, that's not a proper—I objected when there were jurors here who were sexist towards the female lawyers and the female defendant calling the female lawyers "Honey." I also objected strenuously when we had the one juror who we believed exhibited certain racial attitudes and I certainly would object to any suggestion that a person who belongs to a certain religious group since the First Amendment and the freedom of expression and the freedom of association, freedom of religion, that there is some suggestion that they cannot be a part of this jury process. In addition to that, my client is a practicing Muslim and on numerous occasions during pretrial matters, he has, in fact, wore [sic] his cap. Your honor, regrettably, I have to say that's an opinion that the court possesses that is derived outside of this courtroom. Your honor, regrettably, I would ask that the entire panel be stricken because I think that the explanation that [the prosecutor] gave as to 333 was improper.... Your honor, [the prosecutor] simply struck him because he was a young, black male similar in age to Mr. Rice, Mr. Edwards, and Mr. Card and I rejected that explanation by [the prosecutor] and I don't think that it's a proper one in light of [the other juror with a bow tie] and also your honor, regrettably, I have to object to the court's comment about that and joining in with [the prosecutor] that there is some suggestion that people of the Muslim religion cannot be fair and impartial.

Other defense counsel agreed, commenting that the prosecutor's stated reason was "reprehensible" and constituted "discrimination" against "an entire segment of the black population." Appellants' counsel continued to argue racial discrimination, however, and the only arguably substantive comment made regarding the constitutionality of a religion-based strike was one counsel's statement, "We sit up in this court and we say hum, that man looks like he belongs to a suspect category without even having established that the suspect category in and of itself would be enough to exclude someone from jury duty.... I just do not understand how the court can affirm that way of thinking."

It is abundantly clear from this record that defense counsel found the prosecutor's explanation for the strike morally offensive.[8] Nonetheless, we cannot agree

---

8. Other courts have split on whether such strikes are also constitutionally offensive. Compare, e.g., *United States v. Somerstein*, 959 F.Supp. 592, 595 (E.D.N.Y.1997) (holding that *Batson* extends to religious affiliation); *People v. Sanders*, 51 Cal.3d 471, 273 Cal. Rptr. 537, 797 P.2d 561, 574 (1990) (indicating in dictum that peremptory strikes against certain suspect classes, including religion, violate both the federal and California constitutions), *cert. denied*, 500 U.S. 948, 111 S.Ct. 2249, 114 L.Ed.2d 490 (1991), *with, e.g., State v. Davis*, 504 N.W.2d 767, 771 (Minn.1993) (en banc) (concluding, in case involving strike of Jehovah's Witness, that peremptory strikes based on religious affiliation do not violate

with appellants that it was unreasonable for the trial court to interpret counsel's argument as essentially renewing the existing *Batson* objection, *i.e.* "systematic exclusion" of blacks in general and young black males in particular, and that discrimination on the basis of race was the ultimate constitutional issue.

First of all, defense counsel had not objected to the prosecutor's stated reason for striking Juror 333 at the time of the strike, remaining silent even when the trial court soon thereafter indicated that it had now "heard the *Batson* challenges with respect to all the jurors that were struck." Although this fact did not necessarily render counsel's final *Batson* objection untimely, *see Tursio v. United States*, 634 A.2d 1205, 1210 (D.C.1993) ("*Batson* motion will be timely when made at any time before the jury is sworn"), it did put a greater onus on defense counsel to be clear if they intended to raise an entirely new and distinct *Batson*-like claim, *i.e.* discrimination based on religious affiliation.

Second, at the time of the final objection, the only "new" information was that a juror of similar appearance had been seated, thereby creating a basis for a "pretext" argument in relation to the racial discrimination charge. The court, therefore, had no reason to focus on this issue as a basis for a religious discrimination claim.

Third, although counsel did refer generally to the First Amendment, they never mentioned equal protection or provided any legal argument whatsoever for extending *Batson* beyond race. Admittedly, this omission might not be as important today, post-*J.E.B.*, where the Supreme Court has already extended the relevant doctrine to other protected classes. However, in 1993 *Batson* was limited solely to race. Appellants' failure to elucidate the novel manner in which they allegedly proposed that the court apply the reasoning of *Batson* was therefore critical.

the federal constitution), *cert. denied*, 511 U.S. 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994); *Casarez v. State*, 913 S.W.2d 468, 496 (Tex.Crim.App.1995) (en banc) (concluding, in case involving strike of Pentecostals, that peremptory strikes based on religious affiliation do not violate the federal constitution).

A number of state high courts have indicated that, regardless of the federal constitution, such strikes violate or would violate their state constitutions. *See, e.g., People v. Martin*, 64 Cal.App.4th 378, 75 Cal.Rptr.2d 147, 150 (1998) (calling precise issue one of first impression and concluding that strikes based on mere affiliation, as distinguished from religious belief, violate California constitution); *State v. Levinson*, 71 Haw. 492, 795 P.2d 845, 849 (1990) (holding that a peremptory challenge based on "race, religion, sex or ancestry" violates Hawaii Constitution); *Thorson v. State*, 721 So.2d 590, 594 (Miss.1998) (en banc) (holding that state constitution prohibited use of peremptory strikes based solely on religious affiliation); *State v. Langston*, 167 Misc.2d 400, 641 N.Y.S.2d 513, 514–15 (N.Y.Sup.Ct.1996) (concluding that perempto-

ry strikes based on religious affiliation, such as Islam, violate the New York constitution); *State v. Eason*, 336 N.C. 730, 445 S.E.2d 917, 921–23 (1994) (suggesting that strike of juror based solely on religious affiliation, without regard to relevant religious belief, would violate North Carolina constitution), *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995).

For cases expressly involving the confluence of race, ethnicity, and religion, see *United States v. Greer*, 939 F.2d 1076, 1086 n. 9 (5th Cir.1991) ("Whether Jewish jurors are viewed as members of a 'race,' *see Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987), or a religion, a defendant's exercise of peremptory challenges against them is subject to *Batson's* strictures."), *aff'd en banc by an equally divided court*, 968 F.2d 433 (1992), *cert. denied*, 507 U.S. 962, 113 S.Ct. 1390, 122 L.Ed.2d 764 (1993); *United States v. Clemmons*, 892 F.2d 1153 (3rd Cir.1989) (Hinduism), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990); *Joseph v. State*, 636 So.2d 777, 780–81 (Fla.Dist.Ct.App. 1994) (Judaism).

Finally, it is important to recognize the structure of the *Batson* inquiry in this case, especially since it was pre-*J.E.B.* Defense counsel, to the extent they raised a *prima facie Batson* objection to exclusion based on religious affiliation, did so in the context of a continuing argument regarding the trial court's determination of whether the prosecutor's reasons for the peremptory strike were sufficiently race-neutral under the traditional race-based *Batson* analysis. Again, this understandably masked defense counsel's alleged attempt to raise a new and distinct constitutional challenge under *Batson*-like reasoning, especially since counsel concluded the argument by reiterating the sentiment that the prosecutor "simply struck [Juror 333] because he was a young, black male similar in age to Mr. Rice, Mr. Edwards, and Mr. Card." As a practical matter, it seems apparent that the trial court did not understand, and fairly so, that it was being presented with a new and completely distinct legal challenge to the constitutional propriety of a strike based on religious affiliation, given that the court made no comment whatsoever on the issue.

In *Baxter v. United States*, 640 A.2d 714 (D.C.1994), we emphasized the importance of apprising the trial court of the precise legal argument upon which objections to juror strikes are based. Only then will the trial court be in the position to address the issue squarely, make any necessary further investigation and findings, and take corrective action as may be appropriate. In *Baxter*, the defendant on appeal sought to establish that improper strikes had been made on the basis of age and sex discrimination. *Id.* at 717. This court concluded that even though the trial court had commented on the propriety of age discrimina-

tion, the issue simply had not been sufficiently differentiated from the race-based *Batson* ground or exclusion of "young black males" argued to the trial court to preserve it for appeal. *Id.* Since the appellant in *Baxter* "did not raise the allegations of age and gender discrimination with the reasonable specificity necessary to fairly apprise the trial judge of those objections,"[9] we reviewed only for plain error. *Id.* A like situation is presented here.

The necessity for a particularly demanding standard requiring counsel to articulate clearly the parameters of a given *Batson*-like challenge, especially on a novel ground not previously addressed, is demonstrated here. The *voir dire* process itself in this trial occupied a full month. The trial itself took an additional five months. Plainly, it was imperative that any problems with the composition of the jury should, if at all possible, be resolved prior to the commencement of the trial since any error of a *Batson* type mandates reversal without regard to any actual trial prejudice to a defendant. *See supra* note 3. Furthermore, for example, if counsel's objection based on religious discrimination had been front and center, the opportunity could have been afforded to examine at the time, in further detail, an issue that now splits appellants and prosecution; viz., whether in fact what is presented here is religious discrimination or simply political discrimination, arguably governed by a different test. (The prosecutor here never used any phrase plainly religious in nature, speaking only of the followers of a particular individual.) Likewise, more clearly alerted to the nature of the new problem, the trial court could have directed a more focused inquiry into the actual factual situation vis-a-vis the juror's affiliations, if

9. *Cf. Sams, supra,* 721 A.2d at 951 (finding plain error review inappropriate where

"counsel objected twice ... and clearly stated the grounds for her objection both times").

any, and his actual views, religious or otherwise, vis-a-vis those of Louis Farrakhan.[10] The venire panel had already been dismissed, with the consent of all counsel, by the time any real objection was raised even peripherally subject to interpretation as religion-based. Thus, defense counsel had even greater reason and need to alert the trial court that their theory of systematic exclusion of young black males was now being superseded or supplemented by a completely different theory, focused upon a single juror and on a theory of religious discrimination involving First Amendment considerations.

Given all the circumstances here, we simply cannot conclude that anything more than the bare bones of the finely hewn religion-based argument now made to us on appeal was fairly presented to the trial court. As a result, the trial court was not alerted to the necessity of closely considering this entirely distinct basis of claiming constitutional discrimination. Absent such "reasonable specificity," we review for plain error. *See Baxter, supra,* 640 A.2d at 717; *Hunter, supra,* 606 A.2d at 144; *see also United States v. Chandler,* 12 F.3d 1427, 1431–32 (7th Cir.1994) (stating that "[o]nly by pressing a claim of purposeful, racial discrimination—that is, by requesting the trial court to rule on whether the defendant has established purposeful, racial discrimination—does a defendant preserve a *Batson* claim for appellate review" and holding that defense counsel did not make specific enough *Batson* challenge when she merely asked prosecutor to explain why he wanted to strike a black venireperson); *Hopson v. Fredericksen,* 961 F.2d 1374, 1378 (8th Cir.1992) (holding

that defendant did not properly preserve *Batson* challenge for appeal because he did not "request the trial judge to articulate her reasons on the record for overruling the *Batson* objection"); *State v. Shaw,* 14 S.W.3d 77, 83–84 (Mo.Ct.App.1999) ("To preserve a *Batson* challenge, a timely and *specific* objection must be made at trial . . . [especially where] two distinct classifications are involved: race and gender. *Batson* addresses only impermissible strikes based upon race; *J.E.B. v. Alabama ex rel. T.B.,* on the other hand, addresses the gender counterpart. Therefore, a generic reference to *Batson,* without more, is insufficient to preserve a claim of error based upon a gender-motivated peremptory strike.") (emphasis added); *cf. United States v. Humphrey,* 208 F.3d 1190, 1204 (10th Cir.2000) (applying plain error to argument based on legal theory not raised to trial court and stating, "[W]e think it beyond argument that where, as here, the trial testimony arguably supports suppression of the evidence *on a legal basis different from that argued in the motion to suppress,* the defendant must object at trial and *inform the trial court of the new legal basis for excluding the evidence.*") (emphasis in original).

■ Applying plain error, appellants' argument must fail since it was not "obvious and readily apparent" in 1993 that *Batson* applied to any category other than race, let alone religious affiliation specifically. *Baxter, supra,* 640 A.2d at 718 (holding that trial court did not commit plain error since it was not well-settled in this jurisdiction in 1993 whether *Batson* applied to age or sex);[11] *see also Stafford,*

---

10. Appellants argue that the trial court was in fact alerted to the need for this sort of individual inquiry. This was done, however, only in the earlier context of an argument based on racial exclusion, and not when the religion-

based argument was supposedly made after the venire panel was dismissed.

11. In *Coleman v. United States,* 379 A.2d 951 (D.C.1977), a case arising from the armed robbery of two priests in a Catholic church,

*supra,* 136 F.3d at 1114 ("The constitutional status of peremptory challenges based on religion is unsettled, and this is enough to show that the judge's error ..., if it was error, was not a plain error.")

## B. Racial Discrimination

 Appellants also rather briefly argue that the denial of their traditional race-based *Batson* objection was erroneous because the prosecutor failed to give a legitimate, non-discriminatory reason for the peremptory strike (step 2 of the *Batson* challenge) or because it was pretextual (step 3). We begin by noting that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett, supra,* 514 U.S. at 768, 115 S.Ct. 1769. Moreover, we give "great deference" to a trial court's findings with regard to discriminatory intent. *See Evans v. United States,* 682 A.2d 644, 651 (D.C. 1996). In the *Batson* context, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York,* 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion, citing *Batson*). *See Washington Metro. Area Transit Auth. v. Jeanty,* 718 A.2d 172, 180 n. 14 (D.C.1998) ("This finding by the judge [that the prosecution's peremptory strikes were non-discriminatory] turned on his on-

the-scene assessment of counsel's credibility, and we are in no position to second-guess a determination which was obviously informed by the judge's observation of counsel's demeanor."). A successful race-based *Batson* challenge requires a finding that a strike was the result of "racially discriminatory intent or purpose"; racially disproportionate impact is not enough. *Hernandez v. New York, supra,* 500 U.S. at 359–60, 111 S.Ct. 1859 (plurality) (citation omitted); *id.* at 372–73, 111 S.Ct. 1859 (O'Connor, J., concurring). "*Batson* does not require that a prosecutor justify a jury strike at the level of a for-cause challenge. It also does not require that the justification be unrelated to race. *Batson* requires only that the prosecutor's reason for striking a juror not *be* the juror's race." [12] *Id.* at 375, 111 S.Ct. 1859 (emphasis in original).

 When faced with appellants' argument, the trial court ruled that the prosecutor's "gut" reaction to the concerns raised by the juror's appearance—"the bow tie, the close cropped hair, and other issues"—was credible, and not race-based.[13] The court drew on its own practical experience, stating:

> This court is personally aware that there have been several jury trials in this court where there have been 11 to 1 hung juries for the very same reason

---

this court did indicate that it would be unconstitutional to strike all Catholic venirepersons for cause on the assumption that "Catholics as a class, are unable to judge impartially the truth or falsity of the testimony of Catholic clerics because of their religious faith." *Id.* at 953. However, *Coleman* did not address the constitutionality of peremptory strikes based on religious affiliation, except to note that "[i]nquiry as to a juror's religious beliefs is proper on voir dire where ... it is a necessary predicate to the exercise of peremptory challenges." *Id.* at 954.

**12.** The precise *Batson* phraseology is "purposeful racial discrimination." 476 U.S. at 86, 106 S.Ct. 1712.

**13.** Appellants point out that the trial court at one point characterized the prosecutor's justification as "less than acceptable." In context, however, the trial court appears to have been commenting on the prosecutor's subjective sense of concern about juror 333 which contrasted with the fact-based reasons given for other strikes that had also been challenged as race-based.

mentioned by [the prosecutor]. As a matter of fact, this Court tried one of those cases.

Appellants argue that a white man dressed like Juror 333 would not have been stricken. The trial court could reasonably conclude that this did not automatically translate into the requisite racially discriminatory intent or purpose, given the apparently limited composition of the group in question. In the recent case of *United States v. Blanding*, 250 F.3d 858, 2001 U.S.App. LEXIS 9862 (4th Cir.2001), defense counsel for a black defendant struck a white juror whose car had a Confederate flag bumper sticker. The juror had disclaimed "anything having to do with the sentiment," but defense counsel said that nonetheless he was concerned about it. The trial court's ruling that the stated reason was a pretext for purposeful racial discrimination (each of defense counsel's strikes had been of white jurors) was reversed by the appellate court. That court held that the inference that defense counsel had drawn was a "permissible, persuasive, race-neutral inference in the context of a peremptory challenge under the Equal Protection Clause." *See also United States v. Hinton*, 94 F.3d 396, 397 (7th Cir.1996) (striking juror because he wore a "Malcolm X" hat was a race-neutral reason; "[t]he prosecutor's focus was on a perceived militant anti-government aspect of Malcolm X, not his race"); *United States v. Payne*, 962 F.2d 1228, 1233 (6th Cir.), *cert. denied*, 506 U.S. 1033, 113 S.Ct. 811, 121 L.Ed.2d 684 (1992) (striking juror because of association with "black activist groups" was not a race-based reason); *see also State v. Pepper*, 855 S.W.2d 500, 503 (Mo.Ct.App.1993) (striking black postal worker based on political beliefs inferentially held by all postal workers was a race-neutral explanation).

 To be sure, further inquiry could have been made of the juror. However, the Supreme Court made it clear in a per curiam summary reversal that the prosecutor's explanation need not be "persuasive or even plausible. .... [T]he issue is the facial validity of the prosecutor's explanation." *Purkett, supra*, 514 U.S. at 765, 115 S.Ct. 1769. At this second stage of the *Batson* inquiry, the issue is not whether the reason makes sense but whether on its face, it denies equal protection. *Id.* at 769, 115 S.Ct. 1769 It is not until the third step that the persuasiveness of the justification may become relevant— the step where the trial court must determine the genuineness of the explanation and where an "implausible or fantastic" explanation may well be found a pretext for purposeful discrimination. *Id.* at 768, 115 S.Ct. 1769. That is not the case before us. In sum, on this record, we cannot depart from the "great deference" granted to the trial court and to its effective determination that the strike, based upon an inferred allegiance to Louis Farrakhan, related to a genuine race-neutral concern regarding the potential juror's desire to hamstring any possible conviction.

## III. Alleged Trial Errors

### A. *Giglio, Brady,* and Jencks Act Violations

Appellants next contend that the prosecutor committed various *Brady*,[14] *Giglio*,[15] and Jencks Act[16] violations by failing to adequately disclose evidence. *Brady* and

---

**14.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**15.** *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

**16.** 18 U.S.C. § 3500 (2000); *see also Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

*Giglio* require the government to disclose evidence which is both exculpatory to a defendant and material to guilt or innocence, including "[e]vidence that an accused can use to impeach a government witness," *Brown v. United States,* 726 A.2d 149, 156 n. 3 (D.C.1999), *cert. denied,* 528 U.S. 1130, 120 S.Ct. 967 (2000), and prohibit prosecutors from knowingly putting forth false testimony, *Bruce v. United States,* 617 A.2d 986, 992 (D.C.1992), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1878, 123 L.Ed.2d 496 (1993).

 Even assuming nondisclosure, however, the evidence is not "material" and reversal is not warranted "absent a further showing that 'disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable,' " *Farley v. United States,* 694 A.2d 887, 889 (D.C.1997) (quoting *Kyles v. Whitley,* 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)) (exculpatory evidence under *Brady*), *aff'd after remand,* 767 A.2d 225 (2001); *United States v. Huddleston,* 194 F.3d 214, 222 (1st Cir.1999) (impeachment evidence under *Giglio*), or unless " 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury,' " *McNeil v. United States,* 465 A.2d 807, 810 (D.C.1983) (quoting *Giglio, supra,* 405 U.S. at 154, 92 S.Ct. 763). "In this context, '[a] "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Farley, supra,* 694 A.2d at 889 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). We evaluate the materiality of the evidence at issue on a cumulative basis. *Kyles, supra,* 514 U.S. at 436, 115 S.Ct. 1555. However, delayed disclosure of exculpatory or impeachment evidence (as opposed to an outright failure to disclose) will require reversal only if an appellant establishes prejudice from the delay itself.

*See Bellanger v. United States,* 548 A.2d 501, 503 & n. 6 (D.C.1988) (citing *United States v. Ingraldi,* 793 F.2d 408, 411–12 (1st Cir.1986) (due process requirements met where *Brady* material disclosed after beginning of trial, if accused not prejudiced in preparing and presenting his case)); *see also Norris v. Schotten,* 146 F.3d 314, 334 (6th Cir.), *cert. denied,* 525 U.S. 935, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998) (*Brady* does not generally apply to "a tardy disclosure" but rather to "a complete failure to disclose").

 On the other hand, the Jencks Act relates to statements made by government witnesses, regardless of their exculpatory nature or value as impeachment material.

The Jencks Act imposes an affirmative duty upon the government to preserve statements of its witnesses and, on motion of the defendant, to disclose and produce those statements. The Act defines "statement" as either "a written statement made by [a] witness and signed or otherwise adopted or approved by [the witness]" or a "recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by [a] witness and recorded contemporaneously with the making of [the] oral statement."

*McGriff v. United States,* 705 A.2d 282, 287 (D.C.1997) (quoting 18 U.S.C. § 3500(e)(1) & (2)), *cert. denied,* 523 U.S. 1086, 118 S.Ct. 1542, 140 L.Ed.2d 690 (1998). A violation of this act will not result in automatic sanctions; rather, "the administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subject to 'appropriately limited review of appellate courts.' " *Id.* (quoting *United States v. Augenblick,* 393 U.S. 348, 355, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969)) (other internal quotations and citations omitted). "Even

though the Jencks Act provides for sanctions when the statement of a witness is not produced, the choice of a sanction is entirely within the trial court's discretion, as is the decision whether to impose any sanction at all. We will not reverse a trial court ruling under the Jencks Act unless that discretion has been abused." *Id.*

### 1. Delayed Disclosure

■ Over the term of the lengthy trial, appellants raised numerous claims under these doctrines. The trial court carefully examined each claimed violation, and, where necessary, took steps to either sanction the prosecution or rectify the alleged inequity. On more than several occasions, the trial court held hearings to determine the extent of any violations, and whether or not sanctions would follow. On two occasions, the trial court sanctioned the prosecutor for discovery violations and informed the jury of the sanctions and the reasons behind them—namely, that the prosecutor had failed to disclose evidence as required by law.[17] In the relatively rare instances where the trial court ruled that alleged *Brady* or *Giglio* material need not be disclosed, appellants were neverthe-

less not prejudiced because the jury was in fact apprised of claimed exculpations and the witnesses' motives to lie. Although much of the material requested by the appellants was not disclosed initially, the majority of the requested material was turned over to appellants during trial. More importantly, appellants were able to employ those truantly disclosed materials in their cross-examinations of the relevant witnesses.[18] Taken together, these factors rebut the necessary demonstration that appellants were prejudiced, or that the court abused its discretion. Looking at the claims of abuse in this light, we find no reversible error.

Of the numerous claimed violations, the majority represented late disclosure of *Brady* and *Giglio* material. Appellants' counsel were able to exploit this material as part of their defense, and they are unable to show reversible prejudice arising from the tardy disclosure—they point to no difference earlier disclosures would have made in their respective cases, with the exception of their opening arguments. Where, as here, the defense was able to

---

**17.** In addition to these adverse-inference instructions, the trial court responded to other discovery violations by striking an identification of one of the defendants, and precluding the testimony of a police officer.

**18.** For example, witness Fred Johnson's inconsistent statements were exploited in cross examination. Likewise, the late disclosure of notes relating to witness Ida Stanford's testimony and a videotape of her discussions with the police did not constitute reversible error because appellants' counsel were able to cross examine effectively the witness with both the notes and the tape. Also, although the notes of the firearms examiner were disclosed belatedly, the trial court afforded appellants' counsel the opportunity to effectively re-cross the examiner with the notes. *See, e.g., Norris, supra,* 146 F.3d at 334–35 (finding no *Brady* violation where defense counsel received criminologists' tests in time for effective use).

Appellant Edwards also specifically claims that the government erroneously suppressed an exculpatory statement he made to appellant Card's investigator. However, the statement was given by appellant to a defense investigator, and Edwards' counsel possessed the statement as early as January 1994. Thus there was no suppression of *Brady* material. *See, e.g., Rector v. Johnson,* 120 F.3d 551, 560 (5th Cir.1997) ("failure to discover information [that defendant knew or should have know about] was the result of a lack of diligence on [defendant's] part"), *cert. denied,* 522 U.S. 1120, 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998); *Nguyen v. United States,* 114 F.3d 699, 705 (8th Cir.1997) (no *Brady* violation where alleged exculpatory material "came from the books and records of [defendant's] own company").

eventually use *Brady* evidence to cross-examine government witnesses, the requisite prejudice is lacking, and we will not disturb the trial court's ruling.[19] *See Edelen v. United States,* 627 A.2d 968, 972 (D.C.1993) ("[T]he trial judge was on the scene. He was in a far better position than we are to assess the atmospherics of the case and to determine whether, given all that had occurred, [the] defense was appreciably prejudiced by any delay in the [*Brady* ] disclosure ...."); *see also, e.g., United States v. Scarborough,* 128 F.3d 1373, 1376 (10th Cir.1997) ("As long as ultimate disclosure is made before it is too late for the defendant[ ] to make use of any benefits of the evidence, Due Process is satisfied.") (internal quotations omitted).

■■■ Appellants nevertheless argue that the cumulative effect of such "last minute" disclosures undermined the credibility of the prosecutor. This, they argue, indirectly impinged upon the prosecutor's assurances that certain witnesses were not parties to extensive agreements with the government, who in turn gave false testimony against appellants. Appellants, however, misstate their argument by relying on the cumulative effect the alleged *Brady* violations had on the prosecutor's credibility. As *Kyles* makes clear, the relevant inquiry is whether the cumulative effect of suppressed *Brady evidence* raises a reasonable probability that disclosure would have produced a different result, not whether a prosecutor's repeatedly late disclosures under *Brady* might otherwise af-

fect the prosecutor's credibility on other matters. 514 U.S. at 421–22, 115 S.Ct. 1555. The prosecutor's credibility is not *Brady* evidence. Without a demonstration of how the late disclosure of the *evidence* prejudiced their case, the prosecutor's consistently late disclosures cannot form the basis for reversal.

## 2. Nondisclosure

Appellants also point to other situations where alleged *Brady, Giglio,* and Jencks material was not disclosed at all during trial. We need not delve too deeply into a discussion of whether or not the various materials should have been disclosed under either *Brady* or *Giglio* because appellants have failed to demonstrate the reasonable probability of a different outcome flowing from that evidence.

■■■ First, appellants claim that the government was required to produce material relating to the government's favorable treatment of witness Kalvin Bears in exchange for his testimony.[20] After a bench conference on the issue, the trial court denied the *Giglio* motion of appellants' counsel, as well as the request to hold a hearing as to whether Bears' conviction for utterance was dismissed as a direct result of the prosecutor's intervention. Notwithstanding the trial court's denial, the jury heard substantial evidence of the favorable treatment the government gave Bears, and thus the potential motive to fabricate, as well as his extensive criminal record and prior history of drug abuse.

---

19. Though we discern no reversible prejudice here, we note that "we rightly expect prosecutors to resolve all reasonable uncertainty about the potential materiality of exculpatory evidence in favor of prompt disclosure." *Edelen, supra,* 627 A.2d at 971. The consistently late disclosures in this case were far from proper. Ultimately, however, we are mindful that this is not a disciplinary case but rather a criminal appeal.

20. This "favorable" treatment allegedly included dismissal of an uttering charge against Bears, direct or indirect intervention by the prosecutor in two sentencing hearings, allowing Bears to withdraw his guilty pleas in a case in which he faced a minimum five year sentence and for which he subsequently received no jail time, not prosecuting Bears for his escape from a halfway house, and allowing Bears special furloughs from prison.

On direct examination, Bears admitted that he was arrested nine times, and convicted five times, including convictions for armed robbery, and possession of cocaine with intent to distribute.[21] He also testified to both using and distributing illegal substances, and that he was a crack addict at the time of the relevant events.[22] Bears informed the jury that he had recently been arrested on one charge of possession of cocaine with intent to distribute (PWID), one charge of attempted PWID, and one charge of carrying a pistol without a license, that he had pleaded guilty to the charges, and that he faced a mandatory minimum five year sentence up to a maximum of life in prison. He further admitted that the sentencing had been put off, and that he had entered into a limited use immunity agreement with the government in exchange for testifying.[23] That agreement was entered into evidence.

On cross-examination, Bears denied that the government agreed not to charge him in the murder plot. However, he admitted that he had been informed by the government that he could have been charged, but after he agreed to testify in this case, charges were never brought against him. Likewise, Bears denied that he was placed in a halfway house, rather than prison, as a result of his testifying, but nevertheless admitted that he was incarcerated prior to his involvement with the government and was in fact placed in a halfway house where he received weekend passes, on the basis of an unopposed release motion after he testified before the grand jury. Bears also admitted that he escaped from the halfway house but was never charged with a crime for that action.[24]

Bears was cross-examined with the aid of a transcript demonstrating that the prosecutor in this case appeared at Bears' sentencing on his then-pending charges, and that another prosecutor, at another sentencing hearing, indicated that Bears may have been forced into a plea. He was cross-examined on the basis of another transcript wherein, at a sentencing hearing for the PWID and pistol charges, Bears' attorney represented in open court that because of his cooperation in this case, he might make a motion to withdraw his plea. Furthermore, Bears admitted that, after testifying before the grand jury, he was arrested for uttering (stealing a check), that following the arrest he had called the prosecutor in this case, and that the charge was subsequently dropped ("no papered"). He was cross-examined extensively regarding his possible bias arising from this treatment. While disclosure of the allegedly explicit deals, if they indeed existed, was required by *Brady* and *Giglio*, the presentation of the witness to the jury demonstrated something far less than an unblemished facade. The jury was markedly exposed to the witness's potential for bias and lack of credibility. *See Johnson v. United States*, 537 A.2d 555, 559–60

---

**21.** On cross-examination, Bears admitted that these numbers were merely a guess and admitted to a number of other arrests and convictions dating back as far as 1982, ranging from disorderly conduct, to jumping bail, to distribution of cocaine.

**22.** Bears even admitted that he was a "crackhead."

**23.** In 1995, almost two years following his testimony at trial, Bears' attorney filed an unopposed motion to withdraw his guilty pleas to two of these charges, whereupon the government dismissed those charges. The motion made specific reference to the fact that Bears cooperated with the murder trial "without any promise of benefit." He was subsequently sentenced to time served for the attempted PWID.

**24.** According to his testimony, however, he was returned to prison as a result of the escape.

(D.C.1988) ("In light of . . . both the jury's and defense counsel's independent awareness of the circumstances implying the witness' bias and questionable credibility, we find no reasonable probability that disclosure of the [alleged *Brady* material] would have affected the outcome of appellant's trial."); *Hawthorne v. United States*, 504 A.2d 580, 592 (D.C.) (in evaluating an alleged *Giglio* violation, "[w]e . . . may consider the fact that [the witness's] credibility was successfully undermined in other ways"), *cert. denied*, 479 U.S. 992, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986).

■■■■ Second, appellants claim that relevant *Giglio* and *Brady* material was not produced with respect to government witness Ida Stanford. Specifically, they contend that the government intervened on behalf of Stanford to reduce a mandatory twenty year sentence on an unrelated charge to probation, among other claims.[25] However, in light of the trial testimony, appellants fail to adequately demonstrate a reasonable probability that such disclosures undermine the verdict.

Like Bears, the jury was informed of Stanford's extensive criminal past, including her involvement in drugs and arms and her role as a "very large drug dealer in this town." She also admitted that she had lied under oath in a previous trial. She testified further that she had entered an agreement with the government, whereby her cooperation would be reported to the sentencing judge in her pending case. She stated that, based on the subsequent report from the government regarding her cooperation, "the [sentencing] Judge [could] disregard my guidelines and not sentence me to the mandatory 20 years." She explained that the government was not required to file a guidelines departure letter on her behalf, and that if one was filed, the sentencing judge need not follow it. However, she admitted that if she broke the terms of her agreement "the departure letter provision" would be "annulled."

After she testified, Stanford did receive a departure letter and was sentenced to only five years of probation. Appellants argue that the failure to disclose the post-testimony departure violated *Giglio* in light of the evidence that the government had pre-committed itself to assist the witness. However, Stanford was cross-examined extensively on the issue of the government's involvement in her pending sentencing, including the fact that her sentencing was continued until after her testimony in this case. The trial court found that the post-testimony departure letter given by the government represented nothing more than a strategic decision to forego action until after her testimony. In any event, we fail to find the necessary prejudice in any difference between an admitted perjurer and drug dealer who faces the *possibility* of a departure letter being sent on her behalf in light of her testimony, and an admitted perjurer and drug dealer who is *guaranteed* a departure letter prior to testifying.[26] *See Johnson, supra*, 537 A.2d at 559–60;

---

**25.** Because Stanford testified that a contact visit with her children was given in exchange for her testimony, there was no significant prejudice from the prosecutor's failure to disclose the visit as a bargained-for favor.

Appellants' claim with regard to the failure to disclose contact visits evidenced by Stanford's "appearance" of pregnancy also fails. On appellants' request, the court ordered an inquiry regarding Stanford's pregnancy, and a proffer was made that a recent medical exam confirmed that Stanford was not pregnant. Even assuming that Stanford was pregnant, despite the proffer, there is no indication that the jury's knowledge of additional favors, above those Stanford already testified to, would have undermined the verdicts now on appeal.

**26.** Indeed, other courts have suggested that, "rather than weakening the significance for

*Hawthorne, supra,* 504 A.2d at 592.[27] Moreover, the mere fact that a departure letter was, in fact, sent after her testimony does not indicate that Stanford was lying, but rather supports her version of the agreement.

Likewise, appellants have failed to articulate any reversible prejudice from the other claims of failure to disclose required discovery material. Appellants used a dismissed motion for sanctions against the prosecutor to cross-examine Lewis Yancey regarding an alleged meeting with the prosecutor outside the presence of his attorney. Even though an audio tape of Yancey indicating that the gun used by Card may have belonged to someone else was not disclosed, appellants fail to address how the ownership of the murder weapon was material to any issue in the case. With regard to witness James Craille, although his prior inconsistent statements were not revealed, Craille nevertheless testified that he had previously made the false statements. Even without disclosure of alleged contact visits, appellants' counsel acknowledged that Craille "was substantially impeached" in cross-examination.

**3. Inadequate Sanction**

■ Finally, Edwards' claim that the trial court gave an inadequate sanction for

a Jencks Act violation in relation to the government's failure to disclose the grand jury testimony of Detective Bradley fails. Sanctions for such actions are left to the discretion of the trial judge. *See McGriff, supra,* 705 A.2d at 287. We do not think the court's adverse-inference instruction to the jury informing them of the government's failure was an abuse or an otherwise inadequate sanction, especially where appellant was afforded the opportunity to effectively and extensively cross-examine the detective with the previously undisclosed testimony. *See Woodall v. United States,* 684 A.2d 1258, 1265 (D.C.1996) (absent "gross negligence" or "significant prejudice" in failing to preserve Jencks material, court's decision not to strike testimony was not an abuse of discretion), *cert. denied,* 520 U.S. 1130, 117 S.Ct. 1278, 137 L.Ed.2d 354 (1997); *Williams v. United States,* 385 A.2d 760, 763 (D.C.1978) (affirming trial court's refusal to strike testimony despite evidence that police officer deliberately destroyed Jencks material).

**B. *Napue* Violation**

■ "A prosecutor may not knowingly present false evidence or permit evidence, known to be false, to go uncorrected.... A

---

credibility purposes of an agreement of favorable treatment, tentativeness may increase its relevancy. This is because a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced—the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor." *Boone v. Paderick,* 541 F.2d 447, 451 (4th Cir.1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977); *see also Campbell v. Reed,* 594 F.2d 4, 7–8 (4th Cir.1979) ("[A] tentative promise of leniency might be interpreted by a witness as contingent upon the nature of his testimony. Thus, there would be a greater incentive for the witness to try to

make his testimony pleasing to the prosecutor.").

27. Likewise, the court's denial of appellants' request that the government disclose Stanford's INS file, which allegedly would have revealed the government's assistance in Stanford avoiding deportation in exchange for testifying, was not prejudicial. Whether or not such an agreement existed (and there is no evidence that it did), appellants offer no explanation as to how the jury's knowledge of this additional agreement would have harmed Stanford's credibility any more than her testimony actually revealed.

defendant is accordingly entitled to a new trial if there is any reasonable likelihood that false testimony could have affected the judgment of the jury." *Felder v. United States,* 595 A.2d 974, 977 (D.C.1991) (citing *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)) (other internal citations and quotations omitted).[28] Under this theory, appellants allege that the testimony of Stanford and Bears was not only false and misleading, but "carefully crafted" by the prosecutor as such. To succeed in this claim, appellants bear the burden of establishing that: (1) the prosecution's case included false testimony; (2) the prosecution knew, or should have known, of the falsehood; and (3) that the false testimony could have affected the judgment of the jury. *See Napue, supra,* 360 U.S. at 269–71, 79 S.Ct. 1173; *United States v. Griley,* 814 F.2d 967, 971 (4th Cir.1987).

In an effort to expose Stanford's false testimony, appellants rely on the fact that after Stanford testified, her INS detainer was lifted, a sentencing departure letter was filed on her behalf, and she only received probation on her pending charges, even though on the stand she had denied that she was promised particular leniency above a possible departure letter. However, the prosecutor, before the trial judge, denied that the government had unconditionally agreed to file a departure letter or to intercede with regard to her deportation status. In addition, Stanford had already testified to the possibility of future government intervention on her behalf in terms of her pending sentences. *See supra* text accompanying notes 23–25. Finally, we note that the "[i]mposition of [a lesser] sentence does not, of itself, establish that [a witness] had been promised preferential

treatment by the government." *Townsend v. United States,* 512 A.2d 994, 999 (D.C. 1986), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2188, 95 L.Ed.2d 843 (1987). Thus, Stanford's eventual sentence and her immigration posture alone cannot suffice as evidence of false or misleading testimony. Because appellants have failed to demonstrate that Stanford's testimony was actually false or misleading, the claimed *Napue* violation fails.

 In asserting the *Napue* violation in the context of Bears' testimony, appellants point to Bears' denial that the government promised any favors to him other than use immunity, including his inability to remember whether the prosecutor in this case appeared at his sentencing. Appellants rely on transcripts which show that the prosecutor had appeared at one of Bears' prior sentencing hearings, as well the fact that, after he testified, Bears received a lenient sentence. However, although the prosecutor admitted his presence at Bears' prior sentencing hearing, he explained that the government had taken no affirmative action to reduce Bears' sentence. Indeed, the transcripts which assertedly evidence promises of government involvement are equivocal, neither squarely contradicting the prosecutor or Bears' testimony, nor presenting any direct evidence of an agreement beyond the immunity to which Bears testified. The fact that Bears did eventually receive a reduced sentence is insufficient to overcome the trial court's acceptance of the government's assurance that no other agreement had been reached. *See Townsend, supra,* 512 A.2d at 999 (lesser sentence is not *per se* evidence of agreement); *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991) ("It is incumbent upon us, in this case as in

---

**28.** We noted in *Felder* that the proscription applies to misleading evidence as well. *See*

*Felder, supra,* 595 A.2d at 977 n. 8.

any other, to eschew appellate fact-finding."); *Dickerson v. United States,* 677 A.2d 509, 512 (D.C.1996) ("We . . . will not disturb the trial court's factual findings unless they are clearly erroneous or not supported by the record."). In any event, even if we were to assume that Bears' testimony was indeed inaccurate in some particular, the untruthfulness was harmless in light of his testimony as a whole, which intimated to the jury significant government involvement in Bears' past and pending cases and exposed significant credibility issues on cross-examination. *See Hawthorne, supra,* 504 A.2d at 593 (based on substantial evidence of past drug use, among other factors, defense was "successful, to a considerable degree, in impeaching [the witness] as to both bias . . . and as to credibility in general," and "failure to correct [the witness's] false testimony . . . therefore, could not, in any reasonable likelihood, have affected the judgment of the jury").

## C. Edwards' Confession

Appellant Edwards argues that the trial court erroneously admitted his confession for three reasons. First, he claims that the late disclosure of *Brady* material—his own confession—adversely affected the outcome of the suppression hearing. Second, he argues that the trial court, in response to the government's late disclosure of grand jury testimony, erroneously failed to strike the police detective's testimony. Third, he alleges error in the trial court's refusal to reconsider its suppression ruling despite new evidence of Edwards' status as a cocaine addict at the time of his confession.

 As previously explained, Edwards' statement made to a defense investigator was not *Brady* material, in that he either

knew, or should have known of its existence, and knew of the "essential facts permitting him to take advantage of any exculpatory evidence." *See supra* note 16; *Rector, supra,* 120 F.3d at 560. Likewise, the trial court's adverse-inference instruction was an adequate response to the failure to timely disclose the detective's grand jury testimony. *See supra* Part III, A.

 Finally, while newly surfaced evidence may give rise to the need for reconsideration of a pretrial suppression decision, *see Scales v. United States,* 687 A.2d 927, 937 (D.C.1996), and evidence of drug use is relevant to the determination of voluntariness, *see (Cullen) Byrd v. United States,* 618 A.2d 596, 598 (D.C. 1992), the "new evidence" here was far from significant. Edwards claims that during trial the officer suggested that the confession may have been affected by Edwards' illegal drug use, even though at the suppression hearing the officer testified that Edwards was not under the influence of drugs. In fact, at trial, the officer testified only that Edwards was an alleged drug addict—though the officer had no first hand knowledge of this fact—and reiterated that he saw no evidence of drug use at the time of confession. The trial court's initial ruling on the suppression of the confession was therefore still adequately supported by record evidence that Edwards was not under the influence of any type of substance at the time of the confession. Moreover, at trial, appellant's counsel extensively cross-examined the officer, using his prior grand jury testimony, regarding Edwards physical and mental state at the time of the confession, and the jury was specifically instructed to consider the confession, if and only if it determined that it was voluntarily given.[29]

**29.** Appellant Rice's claim that the prosecutor's improper comment on Edwards' redacted confession constitutes reversible error fails because the trial court instructed the jury on

## IV. Merger

Appellant Rice argues that his felony murder conviction merges with the underlying felony, in this case kidnaping. Similarly, appellants Card and Edwards argue that their felony murder convictions merge with their first degree murder convictions. We agree and the government concedes that the sentences merge. *Catlett v. United States,* 545 A.2d 1202, 1219 (D.C.1988), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989) (felony murder merges with underlying felony); *(Samuel) Byrd v. United States,* 510 A.2d 1035, 1036–37 (D.C.1986) (en banc) (first degree premeditated murder and first degree felony murder merge). We therefore remand the convictions to the trial court for the limited purpose of vacating Rice's kidnaping conviction, and Card's and Edwards' felony murder convictions, and for resentencing. In all other respects, the appellants' convictions are

*Affirmed.*

RUIZ, Associate Judge, dissenting in part, concurring in part: [1]

Upon my review of the record, the issue of improper discrimination on the basis of religious affiliation in the exercise of peremptory challenges was raised with the trial court with sufficient particularity and timeliness, and the trial court rejected it on the merits. Thus, it is properly before the court for full, not plain error, review.

I would hold that the equal protection doctrine prohibits peremptory strikes used to discriminate on the basis of religious affiliation, and that where there is a prima facie case that religious affiliation is the reason for a strike, the trial court must, at a minimum, conduct voir dire to determine whether the prospective juror's religious beliefs, rather than religious affiliation, disqualify that person from serving on the particular jury. I conclude that in this case a prima facie case was made that the prosecutor exercised a peremptory strike to eliminate a potential juror on the basis of his presumed affiliation with the Nation of Islam. As no voir dire was conducted to inquire into whether he was in fact so affiliated, and, if so, whether his beliefs disqualified him from serving as a juror in the case, the peremptory strike at issue impermissibly discriminated in the jury selection process. This constitutes *per se* reversible error. *See Arizona v. Fulminante,* 499 U.S. 279, 306–312, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

*The Religion–Based Challenge to the Peremptory Strike was Preserved for Appeal.*

As the majority correctly observes, defense counsel's [2] challenges to the prosecutor's peremptory strikes were initially and primarily focused on counsel's perception that the prosecutor's peremptory strikes revealed a systematic effort to exclude young black males from the jury. As voir dire progressed, however, and the prosecu-

two separate occasions to disregard the confession as evidence of Edwards' co-defendants' guilt—once when the confession was admitted and once before closing arguments. In addition, almost immediately following the statement made in closing, the prosecutor corrected himself and informed the jury that "the statements of Mr. Card and Mr. Edwards ... can be used only to show in actions, only to show their guilt. You can't use those for any other purpose, except for those [two] people individually." *See Freeman v. United States,* 689 A.2d 575, 585 (D.C.1997)

(no reversible error in improper prosecutorial comment where the prosecutor's "immediate rephrasing of the argument mitigated any prejudice to appellants").

1. I join the majority's conclusion that the various claims under *Brady, Giglio* and *Jencks* do not require reversal.

2. There were six co-defendants in the trial court, each one separately represented.

tor explained his strikes, defense counsel's arguments evolved and focused on the challenge based on religious affiliation, and in no uncertain terms objected to the strike of Juror 333 on such basis.

The majority bases its conclusion that only plain error review is necessary on the grounds that defense counsel's objections were untimely and not sufficiently precise to alert the trial judge to the legal basis for the challenge. I disagree. First, the timing of an objection to a peremptory strike cannot be made before the reason for the strike is revealed. Here, the religious basis for the strike of Juror 333 surfaced well into the process, as the prosecutor was trying to explain that the strike of that juror was not race-based. In making that explanation, the prosecutor for the first time stated that the reason for the strike was that he believed Juror 333 looked like "those people who follow Louis Farrakhan who could not be fair to the Government." This was immediately followed by defense counsel's objection to the court that "He [the prosecutor] could have asked him, Your Honor." [3]

The trial court then ruled that the prosecutor's strikes were not race-based, noting, however, that the prosecutor's race-neutral explanation for striking Juror 333 was not "based on facts, observations and information and responses obtained during the voir dire," but on the prosecutor's "gut if you will reaction and he cited particularly the bow tie, the close cropped hair and other issues." The trial court concluded that "[c]onsidering the fact that all other responses have been adequately made by [the prosecutor], I have to allow him that 1 on his gut feeling." [4]

After completing the last two rounds of peremptory challenges and discussing certain other new matters brought up by the prospective jurors on the panel, the trial judge, without objection, released the remaining venire and the proceedings broke for a much-delayed lunch. Immediately after the lunch break, the trial judge returned to the issue of *Batson* challenges with respect to the peremptory strike of Juror 333. At that point, defense counsel clearly made alternative arguments for the challenge of the prosecutor's peremptory strike of Juror 333: 1) the prosecutor's explanation for striking Juror 333 on the basis of his appearance (bow tie, closely cropped hair and white shirt) was pretextual because Juror 1, who had not been struck, also had close cropped hair and wore a bow tie, and 2) the race-neutral reason given by the prosecutor for striking Juror 333, that he was a Muslim, was itself

---

3. The prosecutor's and defense counsel's statements follow:

> [Prosecutor] We have a 25 year old still on the panel in seat number 4, Michael Justice, who is Juror Number 333 and he lives in a very prominent neighborhood that I know very well from the Rayful Edmonds situation in the Trinidad area.
>
> But, I also note that given his appearances, the bow tie and the white shirt and the closely cropped hair, that while I have no indication on the record if there is any indication on the record and if there is some mention of his affiliation with those people who follow Louis Farrakhan who could not be fair to the Government.

> I would not want to risk putting that kind of prejudice on the jury when the Government has to bring the case.
>
> [Defense counsel] He could have asked him, Your Honor.

4. The trial court expressed sympathy for the prosecutor's "gut feeling," stating "[t]his Court is personally aware that there have been several jury trials in this Court where there have been 11 to 1 hung Jurors for the very same reason mentioned by [the prosecutor]. As a matter of fact, this Court tried 1 of those cases."

improper.[5] Other defense counsel joined the objection, emphasizing the impermissible religious basis for the strike [6] and, at one point, further suggesting that, with respect to Islam, discrimination on the basis of religion also amounted to race discrimination.[7] Based on this record, I con-

5. Defense counsel stated:

[T]he [paramount] issue is that the Court was concerned about Juror 33 [sic, 333] because [the prosecutor] could not give what I believe that the Court perceived as a proper explanation and accepted [the prosecutor's] gut reaction.

[The prosecutor] indicated to the Court because the gentleman had short cropped hair and a bow tie, that there is some suggestion that he is a Muslim.

He stated that was his gut reaction and the Court accepted it and I believe that the Court indicated something to the effect of yes, he had close cropped hair and he did have a bow tie and that we had juries— cases before which ended in 11 to 1, basically a hung jury.

Your Honor, Juror Number 1 who is 094 has close cropped hair. He has a bow tie. He had a bow tie on yesterday. . . .

Your Honor, that undercuts [the prosecutor's] argument. *He is saying that he struck the Juror because he is Muslim and this first of all, that's improper. It is improper and I was also shocked when the Court condoned that statement, Your Honor.*

*What the court is suggesting is that people of the Muslim religion or the Muslim practice cannot be fair and impartial. . . .*

*I certainly would object to any suggestion that a person who belongs to a certain religious group since the First Amendment and the freedom of expression and the freedom of association, freedom of religion, that here is some suggestion that they cannot be a part of this jury process.*

*In addition to that, my client is a practicing Muslim and on numerous occasions during pretrial matters, he has, in fact worn] his cap. . . .*

Your Honor, regrettably, I would ask that the panel be stricken because I think that the explanation that [the prosecutor] gave as to 333 was improper.

. . . Your Honor, [the prosecutor] simply struck him because he was a young, Black male similar in age to [the appellants] and I rejected that explanation by [the prosecutor] and I don't think that it's a proper one in light of 094 [the other juror with bow tie and close cropped hair] and also Your Honor, regrettably, I have to object to the Court's comment about that and joining in with [the prosecutor] that there is some suggestion that people of the Muslim religion cannot be fair and impartial.

Accordingly, Your Honor, I would ask that the whole jury be stricken. Your Honor, I was shocked that the Court joined in that comment.

(Emphasis added.)

6. Another defense counsel stated:

If [the prosecutor] had some concerns about anybody that was inherent to the teachings of Louis Farrakhan, [the prosecutor] could have de[lved] into that at the time of the voir dire.

I think that striking a person at this point because of a belief that he may be a follower of Louis Farrakhan is reprehensible for the reasons that [the other defense counsel] espoused during his comments to the Court.

But if that was a concern, we had a process and [the prosecutor] could have raised the issue then and we could have discussed it and if the court felt inclined to grant [the prosecutor's] request for a strike, it could have been done at that time.

Bringing it up now at the 11th hour as the Court deemed it to be a gut reaction, we think that that does not fall into the context of a gut reaction based on the physical description of Juror No.1. . . . So I think his argument rings hollow.

7. A third defense counsel added:

I would point out to the Court that I have a long history of doing discrimination litigation and I know discrimination when I hear it. When I heard what [the prosecutor] was saying, I heard it. He is saying first of all that an entire segment of the Black population because of their religious views or what he presumes to be their views are not worthy to be jurors in America.

Secondly, he is saying that because he presumes a Black person to be a part of that segment, that he is not worthy to be a juror. Your Honor, I don't think that we have heard this kind of language in a long time or at least in America where we have come to the point where we pretend to that let's

clude that defense counsel objected that the strike was impermissible as soon as the prosecutor's attempt to give a race-neutral explanation for his strike revealed a religious basis. As these objections were made before the jury was sworn, they were timely. *See Tursio v. United States*, 634 A.2d 1205, 1209 (D.C.1993).

Second, defense counsel's objections were of such nature and specificity as to put the issue squarely before the trial court. Although, at the time of trial in this case, neither the Supreme Court nor this court had extended *Batson* beyond race-based challenges, we had given strong indications supporting that proposition. In a case in which the defendant had requested that all Catholics be stricken from the jury on the ground that no Catholic could fairly judge the credibility of the priests who were the victims of the crime, we held that

> [a] prospective juror who is otherwise competent to serve on a jury may not be disqualified merely because of religious belief or status. The mere potentiality for bias based on religious affiliation cannot justify the elimination of a prospective juror. Only the demonstration of an actual bias may provide such a justification.

*Coleman v. United States*, 379 A.2d 951, 953 (D.C.1977) (citation omitted). We also adopted the same argument that appellant makes in this case, that the position that all members of a religion should be excluded is " 'suspect' under the 'equal protection' provisions of the Constitution." *Id.* at 954 (citing *Ristaino v. Ross*, 424 U.S. 589, 596 n. 8, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976)). Defense counsel in this case, rather presciently, used the term *Batson* "generically," much as we do today, as encompassing various types of impermissible discrimination in the jury selection process, not as referring solely to race.[8] No doubt the majority is correct that defense counsel did not present the trial court with the "finely honed" argument presented on appeal. That is true in most cases, as few trial counsel have the luxury of time and reflection, in the heat of an ongoing pre-trial proceeding, that is available on appeal. Defense counsel were reacting on the spot to the prosecutor's unfolding explanations. It would be difficult, however, to miss the intensity of counsel's objections, which not only castigated the prosecutor, but took the unusual, and perhaps risky, additional step of expressing "shock" at the trial court's view of the law on the subject of religion-based peremptory strikes. Moreover, the legal basis for counsel's challenges was broadly presented to the trial court. Counsel's objections were framed in terms of references to the "Muslim religion or Muslim practice," "people of the Muslim religion" and "belong[ing] to a certain religious group," see

---

be "politically correct" as we call it. But, there is not even a pre[t]ense] going on here.
*We sit up in this Court and we say hum, that man looks like he belongs to a suspect category without even having established that the suspect category in and of itself be enough to exclude someone from jury duty.*
I have never heard anything like that. Your Honor, it should appall anybody who listens to it and I have to join in [other defense counsel's] comments that I just do not understand how the Court can affirm that way of thinking.

(Emphasis added.)

**8.** As one defense counsel stated:

> Your Honor, primarily the Batson issue here is young Black men and the Government is discriminating against race and sex and age all of which are prohibited. There are all types of discrimination that I think Batson would say should not be allowed although Batson dealt with race and I think that there is an issue of race here because of the number of Black people that the Government struck from the jury 19 versus 5 white.

*supra* note 5, and counsel argued that the strike was "because of their religious views or ... presume[d] ... views," see *supra* note 7. Counsel cast their challenges to the religion-based strike in terms of its involving a "suspect" category, a clear indication of the equal protection basis for their claim. See *supra* note 7. They also made clear that their objections were based in part on the First Amendment. See *supra* note 5. Further, counsel at several times distinguished between impermissible discrimination based on religious affiliation and religious beliefs that could justify a strike, see *supra* notes 5, 6, & 7, noting that the proper procedure would be to inquire about the juror's religious affiliation and, more importantly, his religious beliefs to ascertain whether they are incompatible with jury service.[9]

Finally, the trial court's ruling shows that the judge was aware that counsel's objections were not limited to race. Upon hearing the various defense counsel's race and religion-based challenges to the prosecutor's peremptory strikes, the trial court ruled:

> With respect to the strikes about which [the prosecutor] was asked to give his

explanation, if with 1 exception I indicated that [the prosecutor's] explanation was appropriate and demonstrated a justifiable reason for the striking of those jurors with his peremptory challenges.

> With 1 juror [no. 333], I indicated that the justification given by [the prosecutor] was less than acceptable. However, out of 30 strikes, I am allowing [the prosecutor] to have 1 gut feeling on a strike. Even though the justification was less than acceptable with respect to that one juror, I am permitting it.

The trial court's clear statement that the prosecutor's justification for striking Juror 333 was "less than acceptable" must be understood in the context of the race and religion-based challenges made by defense counsel. The trial court definitely ruled that the strike was not race-based.[10] Having satisfied the trial judge that there was no racial animus to the peremptory strike, the prosecutor would have had no need for further explanation of the strike unless it was understood that there was another basis for the challenge, different than the one based on race. Therefore, the trial court's statement that the prosecutor's ex-

---

**9.** The majority relies on *Baxter v. United States*, 640 A.2d 714 (D.C.1994), for the proposition that the trial court must be apprised of the "precise legal argument upon which objections to juror strikes are based." See *ante* at 18. *Baxter* presented a slightly different issue—whether Baxter made the same claims on appeal as he did to the trial court. In *Baxter*, the court noted that appellant had "substantially revised the position which he took in the trial court ... dropped altogether his claim that race was a factor in the selection of his jury," and "abandoned his claim that he was denied a 'jury of his peers' by the discriminatory exclusion from the jury of 'young black males.'" 640 A.2d at 717. The court noted that, on appeal, "Baxter now contends, instead, that he was denied his constitutional and statutory rights because the prosecutor discriminated in the exercise of his peremptory challenges, both on the basis of

gender and on the basis of age." *Id.* The court concluded that "[e]xcept insofar as they might be viewed as being subsumed in his 'jury of his peers' argument, Baxter's new contentions, namely, that the Constitution and certain statutes proscribe discrimination based on age or sex in the prosecutor's exercise of peremptory challenges, were not made to the trial judge." *Id.* To say that appellants in this case may not have presented to the trial court as polished an argument as they have on appeal, however, *is not the same as* saying that they did not challenge the prosecutor's religion-based explanation for his peremptory strike of Juror 333, which the record shows that they did.

**10.** I join the majority's analysis of the trial court's ruling on the race-based challenge.

planation was "less than acceptable" must have referred to the challenge that the strike was impermissibly based on religious affiliation. The trial court decided, nonetheless, to let one out of thirty strikes go without further scrutiny "[e]ven though the justification was less than acceptable with respect to that one juror." [11] On this record, therefore, I conclude that the objection to a religion-based peremptory strike was presented to and decided by the trial court, and is reviewable on the merits on appeal.

*The Peremptory Strike Based on Presumed Religious Affiliation and Beliefs is Unconstitutional*

The Equal Protection Clause of the Fourteenth Amendment (as well as the equal protection doctrine embodied in the Due Process Clause of the Fifth Amendment) prohibits the state from discriminating on the basis of suspect classifications, such as religious affiliation, which is protected by the First Amendment. *See Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Employment Div., Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 886 n. 3, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Batson* and its progeny, the Supreme Court has recognized that the exclusion of a juror based on race, also a suspect classification, offends the equal protection rights of the excluded juror and undermines "public confidence in the fairness of our system of justice." *See Batson,* 476 U.S. at 87, 106 S.Ct. 1712. The Supreme Court has extended *Batson's* reasoning to exclusion of jurors based on sex, which is accorded "heightened" scrutiny, somewhat less than the scrutiny required for exclusion based on a suspect classification. *See J.E.B. v.*

*Alabama,* 511 U.S. 127, 134, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). As the Court held in *J.E.B.,*

> Today we reaffirm what, by now, should be axiomatic: Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women.

*Id.* at 130–131, 114 S.Ct. 1419.

The same reasoning applies to exclusion based on religious affiliation. *See United States v. Somerstein,* 959 F.Supp. 592, 595 (E.D.N.Y.1997) (*Batson* applies to religious discrimination but "there must be a determination as to whether the religion of the juror is relevant to the issues of the case … only if the religion of the jurors is directly relevant to the crimes at issue, can such a [strike] be proper."); *People v. Martin,* 64 Cal.App.4th 378, 75 Cal.Rptr.2d 147, 151 (1998) (*Batson* extends to religious discrimination, but a "peremptory challenge of a juror on the basis of the juror's relevant personal values is not improper even though those views may be founded in the juror's religious beliefs."); *Connecticut v. Hodge,* 248 Conn. 207, 726 A.2d 531, 550 (1999) (peremptory challenges based on religious affiliation are unconstitutional), *cert. denied,* 528 U.S. 969, 120 S.Ct. 409, 145 L.Ed.2d 319 (1999); *see also North Carolina v. Eason,* 336 N.C. 730, 445 S.E.2d 917, 923 (1994) (peremptory strike legitimate when the prosecutor inquired how religious beliefs, not affiliation, might affect ability to follow law); *United States v. Stafford,* 136 F.3d

11. If the trial court's pass on the "less than acceptable" explanation did not refer to the religion-based objection it can only have referred to the race-based objection. In either case, the trial judge may not allow even one

impermissible strike. *See Little v. United States,* 613 A.2d 880, 885 (D.C.1992) (noting that "the exclusion of even one … member of the venire for racial reasons violates the equal protection clause").

1109, 1114 (7th Cir.1998) (noting the necessity "to distinguish among religious affiliation, a religion's general tenets, and a specific religious belief"). *But see Casarez v. State,* 913 S.W.2d 468, 492 (Tex.Crim.App. 1995) (refusing to extend *Batson* to religious affiliation "[b]ecause all members of the group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all [of them]"); *State v. Davis,* 504 N.W.2d 767, 771 (Minn. 1993) (refusing to extend *Batson* to religious affiliation "because religious bigotry in the use of the peremptory challenge is not as prevalent, or flagrant, or historically ingrained in the jury selection process as is race").

As in *J.E.B.,* the record in this case shows that Juror 333 was excluded, not for any substantive reason that disqualified him from the jury, but based entirely on the prosecutor's and trial court's assumption that, because of his haircut (cropped) and mode of dress (white shirt and bow tie), the young black man must be a Muslim and a follower of Louis Farrakhan, who, in the words of the prosecutor, "could not be fair to the government." The prosecutor acknowledged that there was "no indication on the record" of Juror 333's religious affiliation, much less his beliefs. See *supra* note 3. Such judgment about a person's beliefs based on nothing more than supposition drawn from superficial characteristics is the kind of rank discrimination that the Supreme Court said in *J.E.B.* it is "axiomatic" violates the Constitution's guarantee of equal protection because it fails the relevant constitutional standard of "whether discrimination on the basis of gender in jury selection substantially furthers the State's legitimate interest in achieving a fair and impartial trial." *J.E.B.,* 511 U.S. at 136, 114 S.Ct. 1419. In the case of "suspect" classifications such as religion, the standard is even higher: the state must show a "compelling interest."

*See Employment Div., Dep't of Human Res. of Oregon,* 494 U.S. at 886 n. 3, 110 S.Ct. 1595.

Particularly in this case, where the prosecutor's explanations for striking Juror 333 slipped and slid between two suspect classifications, race and religion, and where religion-based discrimination based on membership in the Nation of Islam necessarily implied race as well, the trial court should have been particularly alert to the potential for unconstitutional discrimination in jury selection. *Cf. J.E.B.,* 511 U.S. at 145, 114 S.Ct. 1419 ("Failing to provide jurors the same protection against gender discrimination as race discrimination could frustrate the purpose of *Batson* itself. Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination."). At least one of the defendants in this case was not only Black, but also Muslim. See *supra* note 5; *cf. Batson,* 476 U.S. at 85–86, 106 S.Ct. 1712 (stating that defendant's right to equal protection is violated by purposeful racial discrimination in the selection of the venire). The challenges to the prosecutor's strike were strenuously and timely pressed by defense counsel, making clear that, if left unexplored, the strike could call into question the ensuing trial. *Cf. Baxter,* 640 A.2d at 717 n. 3 (reiterating "the importance, in cases of this kind, of alerting the judge to the issue as soon as a pattern allegedly emerges, so that a meaningful record can be made.").

It is always troubling to overturn a conviction that results from a crime as serious as the one at issue here, after a significant investment of judicial, prosecutorial and defense resources. The proper course was to address the issue squarely in the trial court, by questioning the potential juror to establish, first, whether he is a member of

the presumed religious group, and, if so, whether his beliefs are such that they disqualify him from serving on this particular jury. As this was not done, and a prima facie case has been made that Juror 333 was excluded based on his presumed membership in the Nation of Islam, reversal is required.